UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,          :

       v.                     :         23 CR. 482 (RPK)

WILLIAM NEOGRA,             :

           Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF WILLIAM NEOGRA

John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
(212) 619-3730
*Attorney for Defendant William Neogra*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

I. THERE IS A PLACE FOR MERCY IN OUR SYSTEM OF CRIMINAL JUSTICE ..............2

II. WILLAIM NEOGRA'S BACKGROUND AND FAMILY LIFE ...........................................3

III. THE COURT SHOULD IMPOSE A NON-GUIDELINES SENTENCE ............................10

    A. Introduction....................................................................................................10

    B. Objections to Probation's Guidelines Calculation ......................................11

    C. The Guidelines Are Advisory And Only One Factor To Be
       Considered By The Court ...........................................................................14

    D. A Non-Guidelines Sentence of Probation With Conditions Is Sufficient,
       But Not Greater Than Necessary, To Comply With The Purposes Set
       Forth In Section 3553(a)(2) .......................................................................23

       1. A non-Guidelines sentence is sufficient to reflect the seriousness of the offense,
          promote respect for the law and provide just punishment for the offense ..............24

       2. A non-Guidelines sentence of probation with conditions would not
          encourage criminal conduct .....................................................................25

       3. A sentence not requiring incarceration is sufficient to
          protect the public from future wrongdoing by William Neogra .............................27

          a. Lack of means .................................................................27

          b. Low risk of recidivism ........................................................27

    E. The Remaining Section 3553(a) Factors, Which The Court
       Must Consider, Support A Non-Guidelines Sentence .................................29

       1. The nature and circumstances of the offense support a non-Guidelines
          sentence for William Neogra ....................................................................30

       2. The history and characteristics of William Neogra support a
          non-Guidelines sentence ..........................................................................30

          a. The offense of conviction is not reflective of
             William Neogra's life ......................................................31

i

      b.  William Neogra's family circumstances lend support for a non-Guidelines sentence. ...................................................................32

  3.  Considering the kinds of sentences available, this Court should impose a non-Guidelines sentence on William Neogra ...........................................34

  4.  After considering the Guidelines sentencing range in this case, the Court should vary from the Sentencing Guidelines and impose a non-Guidelines sentence on William Neogra ........................................35

      a.  The Guidelines Generally ................................................................35

      b.  Specific Objections to the PSR's Guidelines Calculations.............................41

  5.  Imposing a non-Guidelines sentence on William Neogra will not result in unwarranted sentencing disparities...................................................41

  6.  The Need To Provide Restitution .........................................................43

  **7**.  No Fine Should Be Imposed...............................................................43

CONCLUSION.....................................................................................43

**TABLE OF AUTHORITIES**

**TABLE OF CASES**

*Cunningham v. California*,
    549 U.S. 270 (2007) ................................................................................ 17 fn.

*Gall v. United States*,
    522 U.S. 38 (2007) ................................................................................ *Passim*

*Irizarry v. United States*,
    553 U.S. 708 (2008) ................................................................................ 20

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ................................................................................ *Passim*

*Koon v. United States*,
    518 U.S. 81 (1996) ................................................................................ 20

*Nelson v. United States*,
    555 U.S. 350 (2009) ................................................................................ 16

*Rita v. United States*,
    551 U.S. 338 (2008) ................................................ 14, 17, 17 fn., 18 fn., 41

*Simon v. United States*,
    361 F. Supp.2d 35 (E.D.N.Y. 2005) ............................................ 16, 35

*Spears v. United States*,
    555 U.S. 261 (2009) ................................................................ 17, 17 fn., 35

*United States v. Adelson*,
    441 F. Supp2d 506, 513-514 (S.D.N.Y. 2006)
    aff'd 301 Fed. Appx. 92 (2d Cir. 2008) .................................. 10, 36, 36 fn, 37

*United States v. Antonakopoulos*,
    399 F.3d 68 (1st Cir. 2005) ................................................................ 33 fn.

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................ *Passim*

*United States v. Canova*,
    412 F.3d 331 (2d Cir. 2005) ................................................................ 33

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2009)(*en banc*),
    *cert. denied*, 129 S. Ct. 2735 (2009) ...........................................................................18

*United States v. Chase*,
    560 F.3d 828 (8th Cir. 2009) ...........................................................................32

*United States v. Cole*,
    662 F. Supp.2d 632 (N.D. Ohio 2008)..................................................................23, 26

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005)...........................................................................32 fn.

*United States v. Davis*,
    No. 07 Cr. 727, 2008 WL 2329290 (S.D.N.Y. June 5, 2008)....................................31, 32

*United States v. Dominguez*,
    296 F.3d 192 (3d Cir. 2002)...........................................................................33 fn.

*United States v. Dorvee*,
    604 F.3d 84 (2d. Cir. 2010)...........................................................................40

*United States v. Emmenegger*,
    329 F. Supp.2d 416 (S.D.N.Y. 2004)..................................................................36

*United States v. Faibish*,
    12 Cr. 265 (E.D.N.Y. March 10, 2016) ...............................................................39

*United States v. Ferguson*,
    584 F. Supp.2d 447 (D. Conn. 2008)..................................................................39

*United States v. Gardellini*,
    545 F.3d 1089 (D.C. Cir. 2008) .......................................................................27

*United States v. Greene*,
    249 F. Supp.2d 262 (S.D.N.Y. 2003)..................................................................33

*United States v. Gupta*,
    904 F. Supp.2d 349 (S.D.N.Y. 2014)..................................................................37

*United States v. Hadash*,
    408 F.3d 1080 (8th Cir. 2005) ........................................................................31

*United States v. Hoffmann*,
    No. 8:05CR282, 2006 WL 3390736 (D. Neb. Nov. 22, 2006).........................................28

iv

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008) ............................................................... 31, 33 fn.

*United States v. Hundley*,
   02 Cr. 441 (S.D.N.Y. 2005) ............................................................... 40

*United States v. Jackson*,
   364 F.3d 22 (2d Cir. 2003) ............................................................... 40

*United States v. Jones*,
   531 F.3d 163 (2d Cir. 2008) ............................................................... 20

*United States v. Kloda*,
   133 F. Supp.2d 345 (S.D.N.Y. 2001) ............................................................... 2, 16

*United States v. Lauerson,*
   348 F.3d 329 (2d Cir. 2003) ............................................................... 40

*United States v. Lauerson*,
   362 F.3d 160 (2d Cir. 2004) ............................................................... 40

*United States v. Lawrence*,
   254 F. Supp.3d 441 (E.D.N.Y. 2017) ............................................................... 26

*United States v. Litvak*,
   3:13 Cr. 19 (D. Conn. July 23, 2015) ............................................................... 39, 39 fn.

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ............................................................... 39 fn.

*United States v. Menyweather*,
   447 F.3d 625 (9th Cir. 2006) ............................................................... 43

*United States v. Munoz-Nava*,
   524 F.3d 1137 (10th Cir. 2008) ............................................................... 33 fn.

*United States v. Nesbeth*,
   188 F. Supp.3d 179 (E.D.N.Y. 2016) ............................................................... 24

*United States v. Parris*,
   573 F. Supp.2d 744 (E.D.N.Y. 2008) ............................................................... 18, 36, 39, 42

*United States v. Peterson*,
   363 F. Supp.2d 1060 (E.D. Wisc. 2005) ............................................................... 43

*United States v. Prisel*,
  No. 07-3281, 2008 WL 4899451 (6th Cir. Nov. 13, 2008) (unpub)...........................33 fn.

*United States v. Ruiz*,
  No. 04 CR.1146-03, 2006 WL 1311982 (S.D.N.Y. May 10, 2006)...............................27

*United States v. Seval*,
  2008 WL 4376826 (2d Cir. Sept. 25, 2008) ..............................................................18

*United States v. Singh*,
  877 F.3d 107 (2d Cir. 2017) .....................................................................................2, 43

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009)..........................................................................................42

*United States v. Treacy*,
  No. 8 Cr. 366 (S.D.N.Y. 2009) ...................................................................................40

*United States v. Wachowiak*,
  496 F.3d 744, 754 (7th Cir. 2007) ..............................................................................33

## AUTHORITIES

18 U.S.C. § 3553(1) .....................................................................................................30

18 U.S.C. § 3553(a) ................................................................................................*Passim*

18 U.S.C. § 3553(a)(2)....................................................................................21, 22, 41

18 U.S.C. § 3553(a)(3).................................................................................................34

18 U.S.C. § 3553(a)(4).................................................................................................15

18 U.S.C. § 3561(c)(1)................................................................................................34

18 U.S.C. § 3563(a)(2)................................................................................................34

18 U.S.C. § 3582.........................................................................................................29

18 U.S.C. § 3661 .....................................................................................................32 fn.

28 U.S.C. § 994(j)................................................................................24, 31, 33 fn., 34

Sentencing Reform Act ("SRA")..........................................................................15, 16

Sixth Amendment ................................................................................................15, 17 fn.

U.S.S.G. § 2A3.2 ..................................................................................................18

U.S.S.G. § 2A4.2 ..................................................................................................18

U.S.S.G. § 2B1.1 ............................................................................................*Passim*

U.S.S.G. § 2B1.1(a)(1)..........................................................................................10

U.S.S.G. § 2B1.1(b)(1)(I) ......................................................................................10

U.S.S.G. § 2B1.1(c)(10)(C) ...................................................................................10

U.S.S.G. § 2B3.1 ..................................................................................................18

U.S.S.G. § 2B3.1(b)(3)(D) ....................................................................................18

U.S.S.G. § 2B3.2(a) ..............................................................................................18

U.S.S.G. § 2D1.1 ..................................................................................................18

U.S.S.G. § 2K1.4 ..................................................................................................18

U.S.S.G. § 2L1.1 ..................................................................................................18

U.S.S.G. § 3B1.1(c) ..............................................................................................10

U.S.S.G. § 3B1.1(e) ..............................................................................................11

U.S.S.G. § 2E1.1(b) ..............................................................................................10

U.S.S.G. § 4C1.1..............................................................................................10, 11

U.S.S.G. § 5B1.1 ..................................................................................................35

## MISCELLANEOUS

Robert J. Anello and Richard F. Albert, "Rise of ABA Task Force's
    'Shadow Sentencing Guidelines,'" N.Y.L.J. April 5, 2016................................................38

Steven C. Bahls, President of Augustana College, Homily presented at Augustana College,
    October 21, 2003, available at
    https://www.augustana.edu/about-us/president/justice-and-mercy ...................................2

Frank O. Bowman, III, *Comment on Proposed Amendments to Economic Crime Guideline, § 2B.1.1* (Feb. 19, 2015) at p. 2 (citing remarks of Judge Patti B. Saris, Jan. 9, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings -and-meetings/20150109/Remarks.pdf)....................................................38

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after Booker*, 20 Fed. Sent. R. 167 2008 WL 2201039 at *4 (Feb. 2008)................................37

Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999)(summary at http://members.lycos.uk/awnet/SENTENCE.pdf) ................................................ 25, 26 fn.

Immanuel Kant, *The Science of Right* (W. Hastie trans., 1790) ...................................................26

Bill Keller, "America on Probation," The New York Times, Monday, January 27, 2014, pg. A19, col. 1-5 ................................................................................25

Eric Muller, "*Virtue Of Mercy In Criminal Sentencing*," Seton Hall Law Review 24, Issue 1 (1993)..........................................................................................................2

Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005) ...............................................................................26

Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998) ...........................36

Derek R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentence Regime in White-Collar Criminal Case*, 59 Duke L.J. 1001 (2010) ....................................................................................36

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ...........................................................25

Senate Report No. 98-255.........................................................................................34

## ONLINE CITATIONS

Federal Register available at https://www.federalregister.gov/documents/2024/12/06/2024-28743/annual-determination-of-average-cost-of-incarceration-fee-coif .................... 26 fn.

Former Attorney General Eric Holder, American Bar Association's House of Delegates on August 12, 2013, comments are available at http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html .........................................................................25

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission (May 2004) http://www.lb5.uscourts.gov/ArchivedURLs/Files/08-10643%281%29.pdf ...................28

*Recidivism and the First Offender* (May 2004) <http://ussc.gov/publicat/Recidivism_General.pdf> ........................................................27

United States Courts: *The Public Costs Of Supervision Verses Detention,* published on June 5, 2025 available at https://www.uscourts.gov/data-news/judiciary-news/2025/06/05/public-costs-supervision-versus-detention ............ 26 fn.

U.S. Sentencing Commission, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score,* (Jan. 4 2005)  <http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf> ..........28

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 47 (2004 ). ........................................................... 19 fn.

U.S. Sentencing Commission, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987), <http://www.fd.org/pdf_lib/Supplementary%20Report.pdf>................................ 19, 19 fn.

U.S. Sentencing Commission, *2023 Sourcebook of Federal Sentencing Statistics*...........................................................................................41 fn., 42 fn.

Authorship of quote "*Not everything that can be counted counts and not everything that counts  .. can be counted.*" https://www.google.com/search?q=when+and+where+did+einstein+say+%22Not+everything+that+can+be+counted+counts%2C+and+not+everything+that+counts+can+be+counted&authuser=0&aep=21&udm=50&utm_source=google&utm_campaign=aim_aware&utm_content=oo-seaport-10215&mtid=jpbRaOboH8KgiLMPsoCFuQ4&mstk=AUtExfD_9tBudNI4ejkHx8iarWYjkwpUF7y9o8LKJONtACStTk5ENW6rnrgzK69m8n8waUC77nRHUha4nsDbbYsbxGsxPDBos6rYKLaID4zN7h_2By8f2CarSlhgUeooo4XKCxOSaeTZRqf5NEbBRujBIGtnJkHVy2h75_w_Zr-OetgBp4MC_tA06nHzB7psiJAIcCXlLUjkHVOd17o6MQZnoeExj2ARMAnNXimQjg2G9fMIx7CGGj7-SsbsgroA0Jd1d5PLWpg8zbTcEG0WcVH8pbwUp9c9C5S9tCDzSf88ZuPKVGFZSk9TYONQtPWcVKJMe6xKlmdO6inUSjvnXniwgP03npdeIuiUw&csuir=1..............20 fn.

## PRELIMINARY STATEMENT

William Neogra respectfully submits this sentencing memorandum in support of his request for a non-Guidelines sentence of time served and probation, with a period of 18 month home confinement and community service as conditions.  In our respectful view, such a sentence is "sufficient, but not greater than necessary" to achieve the sentencing purposes set forth in 18 U.S.C. § 3553(a).  That is because Mr. Neogra has accepted responsibility for his offense and made positive changes in his life that are worthy of consideration, and because his participation in the offense began and continued during a very difficult time in his life and once caught up in the offense he lacked the courage to just say "No" and remove himself from the offense conduct.

Taking into account Mr. Neogra's life history, the continued support of his immediate family, which he appreciates, his commitment to living a productive law-abiding life going forward, his full acceptance of responsibility and unqualified remorse, his positive and responsible conduct in the almost two years while on bail release, and his several health issues, a non-Guidelines sentence of time served, probation, home confinement and community service (and guidance from the Probation Officer) would be appropriate at this point in time for Mr. Neogra.

We acknowledge that this would reflect a substantial variance from the Guidelines applicable to this case (33 to 41 months for reasons we address more fully elsewhere in this submission), but as Portia stated, in Shakespeare's "*Merchant of Venice*," in perhaps one of the most eloquent and most often-quoted verses in English literature, "the quality of mercy is not strained," it is a divine attribute "like falling rain" falling from "heaven."  We accept that there also must be justice, but justice without mercy is not justice.  As Shakespeare noted further in

Portia's soliloquy, "Mercy seasons justice."  Mr. Neogra has admitted his wrong doing, accepted responsibility for it and now asks for mercy.

## I.  THERE IS A PLACE FOR MERCY IN OUR SYSTEM OF CRIMINAL JUSTICE

We acknowledge that the relationship between justice and mercy is a difficult legal and public policy question.  In our respectful view, justice at its best is designed to restore relationships.  In certain instances, of which this case is one, the restoration and continuation of Mr. Neogra's relationship with his family, and given his health issues, is of paramount importance.  While Mr. Neogra's plea to the offense is justice, mercy allows the consequences to be tailored to the situation and "mercy can strengthen justice when it restores relationships and fosters the responsibilities associated with positive relationships."  Steven C. Bahls, President of Augustana College, Homily presented at Augustana College, October 21, 2003, available at https://www.augustana.edu/about-us/president/justice-and-mercy.

Further, the virtue of mercy "is neither a redundancy of justice nor an indefensible deviation from justice."  Instead, for a judge who must sentence an offender from a broad range of authorized punishments, "mercy is a guarantor of justice," a moral virtue, and urges against a truly retributive system of criminal justice.  Indeed, mercy "stands between retribution and revenge" as a "check" against overly identifying with "those who have been wronged by a crime."  *See* Eric L. Muller, "*Virtue Of Mercy In Criminal Sentencing,*" Seton Hall Law Review 24, Issue 1, pgs. 343-346 (1993).  Mercy allows the Court to see the humanity of a person, i.e., that a person, here William Neogra, son, father, brother and friend, is more than the worst thing he has ever done - - the offense conduct at issue here.  There is a place for a just mercy in the administration of our criminal justice system.  *See United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017); *United States v. Kloda*, 133 F.Supp. 2d 345, 349 (S.D.N.Y. 2001) (noting that "the Guidelines may be

2

tempered by compassion"). Mr. Neogra has acknowledged his guilt and asks for mercy.

## II. <u>WILLIAM NEOGRA'S BACKGROUND AND FAMILY LIFE</u>

Like most offenders who come before the Court, William Neogra is a complex individual, with no single narrative. He cannot simply be defined by the offense of conviction. His life, like each person's life, contains contradictions and a compilation of facets, dimensions and stories. If we simply reduce William Neogra to the single fact of his offense, we take away all of his humanity. That is not the aim of sentencing. Indeed, the aim of sentencing is to view the entire person. The goal of sentencing is to find the right balance among what at times may be conflicting narratives and to impose a sentence "sufficient, but not greater than necessary" in a given case for a particular defendant at that time when sentence is being imposed.

Mr. Neogra's childhood was normal. He went to school, earned a degree in engineering and went to work. He worked in his field and was progressing well. He and his first wife had two children, a son and a daughter. As his son began to rebel against his mother's strict rigidness, married life became difficult. William tried to mediate the conflict without success. Life came crashing down when at the age of 15, his son Vincent (now 32) was in a horrible vehicular accident. Vincent and three friends were hit be a speeding vehicle. Vincent was thrown 30 feet and landed on the asphalt. He suffered a brain bleed and suffered and still suffers from short-term memory loss as a result. Worse yet, one of Vincent's three friends was killed. Psychiatrists have opined that Vincent suffered "survivor's guilt" and has never been right since. After Vincent's injuries, Mr. Neogra and Mrs. Neogra argued even more than before. Married life became more difficult, particularly after Mrs. Neogra refused to take her prescribed medications. As a result, the marriage deteriorated further and in 2009, Mrs. Neogra commenced divorce proceedings, which ended in 2010 with a judgment of divorce.

As part of the divorce settlement, Mr. Neoga agreed to pay his ex-wife $725 per week ($37,700 annually). Mr. Neogra relates that the divorce proceedings were particularly difficult. Vincent's mental health also was affected negatively by both the turmoil in the home and his head and psychological injuries and trauma from the accident. Since the accident at the age of 15, until about 6 months ago, Vincent did nothing. He lived in the basement of his mother' house, never obtained a job (until about six months ago), and spent most of his time playing video games all night and sleeping all day.

As a result of the divorce and his son's head injury, and despite Mr. Neogra's best efforts to maintain a relationship with his son, Mr. Neogra and his son became estranged. They last spoke about one year ago at the wedding of Mr. Neogra's daughter (Vincent's sister). Mr. Neogra's relationship with his daughter is excellent.

It was during and in the midst of all of his life turmoil that Mr. Neogra went to work at Atronix (later to become Atronix-P&M Joint Venture and then to morph onto Fire Alarm Electric) leading to his participation in the offense conduct. With all the ongoing stress in his life, Mr. Neogra simply lacked the strength and courage to say "No" to becoming involved in the offense and instead of leaving, he closed his eyes and, as he says, he "Went along with the program" and helped create the fraudulent documents at the center of this case. He simply and regrettably was afraid of losing his job and so he continued in a number of positions with titles but with no control over the activities of the companies or their finances. He was a salaried employee, with titles, but without any real control. Total control was exercised by his co-defendant, Walter Stanzione, or by members of Mr. Stanzione's family.

In 2017, Mr. Neogra again found happiness. He met and later in 2022 married Tracy Neogra. By then, it was far too late for him to alter the things he had done and he continued

4

knowingly signing false payment requests.  Notwithstanding his acknowledgement of guilt, Tracy is very supportive.  Together they live very simply and are able to cover their monthly personal and household expenses, albeit, just barely.  Mr. Neogra, in one sense, is at peace in that he has owned up to his past and laid bare his life for the determination of the Court.  In another sense, he is under great stress as he confronts the possibility of incarceration at this age and stage of his life and with his several infirmities such that the simple task of just walking any distance has become difficult.  Presently, Mr. Neogra suffers diabetes with kidney complications and diabetic nephropathy, hyperglycemia, osteoarthritis in both hips and lumbar spine degeneration, diabetic polyneuropathy and aortic valve stenosis.  His health is another factor which we ask the Court to consider at sentencing.

As noted in the letters submitted and annexed to this memorandum at Exhibits "2" and "3," William Neogra has many good qualities.  He is described as caring, kind, generous, charitable and a good father.  These letters are a testament to the decency in William Neogra. Some writers describe events of significance; others describe the simple everyday kindnesses of helping a neighbor or stranger.  Such simple everyday acts of kindness provide a window into the good of a person and provide context by which to measure a person's life, which cannot be measured simply by a box on a sentencing grid.  William Neogra's inner kindness has extended to his family, his neighbors, his friends and to the community in which he lives.

He is and has been a good family man and a "good neighbor" in his communities.  His devotion to his family and his community and his hard work, charitable and good deeds and acts of kindness and compassion bespeak another dimension to William Neogra beyond his offense conduct.  His family has been rocked by his arrest, his plea of guilty and now his approaching sentencing.  The pressure on him and his wife and family has been great.  The pain of Mr.

Neogra's family is immeasurable, as is his own personal pain and sadness, and his regret for the conduct which brings him before he Court.

In sentencing William Neogra, we ask the Court to consider the good in Mr. Neogra and not focus solely on the offense conduct. There is far more than simply the narrative of this offense to William Neogra and in fashioning an appropriate sentence, Mr. Neogra's humanity should not be overlooked or rendered insignificant. In his own Personal Statement to the Court, without mincing words and with an honest and open self-reflection and dissection, Mr. Neogra has acknowledged his wrongdoing. His acknowledgement that he was too weak to say "No" to participating in the offense conduct is heartfelt and sincere. He expresses his profound remorse for what he did and for disappointing those who love him, and whom he has disappointed so greatly. A copy of Mr. Neogra's letter and personal statement to the Court is annexed hereto as Exhibit "1."

The many letters of support from family and friends also submitted herewith bespeak of a man humiliated and embarrassed by his current situation. These letters also offer valuable insight into the real William Neogra, who apart from his offense conduct, is respected for his kindness, compassion and goodness. Letters of support from Mr. Neogra's family and friends are annexed hereto as Exhibits "2" (family) and "3" (friends).

While Mr. Neogra's family is blameless for the crimes for which he stands convicted, they also suffer and have suffered first-hand, and continue to suffer, from the collateral consequences of this matter and the uncertainty of their futures. In her letter to the Court (Contained in Exhibit "2"), Mr. Neogra's wife, whom he met in 2017 and later married in 2022, has concern for Mr. Neogra and his own physical health, and writes about how the arrest has affected her, saying "her life does not work without him." Without doubt she wants the best for

6

Mr. Neogra; she also has her own fears of what life going forward will be like if Mr. Neogra were incarcerated.

Also annexed hereto and contained in Exhibit "2" are letters from Mr. Neogra's daughter and his brother. His daughter, Victoria Holihan, describes Mr. Neogra as a "calm and steady" presence in her life and states that

> "[d]uring my childhood, especially through difficult periods such as my parents' divorce, he provided a safe and supportive space for me. His ability to remain composed under stress and to offer stability during uncertain times was something I came to rely on."

Victoria notes further that Mr. Neogra "worked tirelessly" to support the family financially and made sure that the family had what they needed. She adds that "[d]espite whatever personal or professional challenges he faced, he remained committed to our well-being." She concludes her letter with a plea for leniency for her father and notes that Mr. Neogra "always tried to take care of those around him" and that she believes her father "has the capacity for growth, accountability and positive contribution moving forward."

Mr. Neogra's brother, Robert Neogra, speaks of the contributions Mr. Neogra has made to Robert's life and how he helped to make Robert a better person. He notes Mr. Neogra's compassion and offers his observation about his brother that he "always put others first." He describes his brother as a "good husband and loving father" and he opines that he can repair anything electrical. He notes Mr. Neogra's love of music and his musical talents, and describes that even today, Mr. Neogra "will try to lend a helping hand when asked." He notes also that Mr. Neogra "is not a healthy person and doesn't get around too good." Robert requests that his brother be given the "chance to continue making a positive impact on those around him.

Mr. Neogra's daughter and brother also have suffered and are suffering from what has occurred. Their father and brother has been arrested, indicted and convicted, a harsh reality of their lives. Their heartfelt letters request a second chance for Mr. Neogra.

Other family members also have written in support of Mr. Neogra. (Their letters also are annexed hereto as part of Exhibit "2"). His sister-in-law, Lee Ann Neogra (his brother's wife), writes how she and Mr. Neogra have known each other since their childhood years. She describes Mr. Neogra as "loving, caring and [a] dedicated" husband father and brother and notes that she observed him "fulfill responsibilities with diligence and dedication." She notes further that Mr. Neogra always was available to her to lend a helping hand or to provide advice.

Members of his wife Tracy's family also speak kindly of Mr. Neogra. Cody Hagan describes Mr. Neogra as "kind, respectful, and compassionate," and always willing "to lend a hand or offer support," and that Mr. Neogra "treats people with dignity and compassion." Mr. Hagan feels strongly that Mr. Neogra has the capacity "to redeem himself" and make a "positive impact on others."

Angela Kusha, another member of Tracy's family, writes that Mr. Neogra is "sincere and accountable," "owns up" to his mistakes and will try to "make it right." She notes that Mr. Neogra "treats others with respect." and "is grounded, kind and genuinely wants to do good."

Friends of Mr. Neogra also speak well of him. (Letters of support from friends of Mr. Neogra are annexed hereto as Exhibit "3"). They also speak of Mr. Neogra's inner goodness and kindness. They describe the simple everyday kindness of Mr. Neogra that make people friends, whether it was helping a neighbor going through a divorce, fixing an appliance, supporting local charity events, caring for a neighbor's dog, helping to install breaks on a neighbor's car, helping to clear snow or replacing a kitchen faucet. Not extraordinary by any means, but the simple

everyday kindnesses that filled and fill Mr. Neogra's life and permit a look into the heart of Mr. Neogra. While no longer able, because of his health, to do some of the things he had been able to do before, to a person, they describe Mr. Neogra as kind and compassionate

For his part, Mr. Neogra is regretful beyond words. Further, as the Court will see, Mr. Neogra's regret is great and that also is a thread running through many of the letters of support submitted on his behalf. Of course, Mr. Neogra recognizes that his present circumstances have disappointed many. The authors of these letter of support also have seen firsthand Mr. Neogra's regret and shame for his present circumstances, yet at the same time they note his dedication to his family and his many kindnesses to family, friends, neighbors and others.

The letters describe Mr. Neogra as a kind, compassionate and caring person and generous with his time and resources. They refer to him as a true and loyal friend, who would lend a hand in any situation. Of course they also express their own disappointment at Mr. Neogra's current circumstances and the damage that this has done to his family. They acknowledge their own shock and sadness to learn of Mr. Neogra's conviction. Yet they remain supportive. They have seen firsthand the effects this has had on Mr. Neogra and his family. However, to a person they all have seen in Mr. Neogra his regret, his shame, his embarrassment, his acceptance of responsibility and his sincere desire to make right what he has done, to get back on his feet and to move forward with his life.

It is not always easy to juxtapose the good a person does in his life next to the fact that a person has pleaded guilty to a crime. But it does help to shed light on the other side of a person which needs to be recognized and taken into account at sentencing. As has been said:

> "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing when his very future hangs in the balance . . ..[this] was plainly what Congress had in

> mind when it directed courts to consider, as a necessary sentencing factor, the 'history and characteristics of the defendant'."

*United States v. Adelson*, 441 F. Supp.2d 506, 513-514 (S.D.N.Y. 2006) *aff'd* 301 Fed. Appx. 93 (2d Cir. 2008).

## III.  THE COURT SHOULD IMPOSE A NON-GUIDELINES SENTENCE.

### A.  Introduction

The Presentencing Report ("PSR") at ¶¶ 21 through 32 calculates an advisory Guidelines sentencing Offense Level of "24" for Mr. Neogra.  This offense level is based on: a base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1), with an additional "loss" enhancement of 16 levels for a loss greater than $1,500,000 (PSR ¶ 23), *see* U.S.S.G. § 2B1.1(b)(1)(I), an additional 2 levels for sophisticated means pursuant to U.S.S.G. § 2B1.1(c)(10)(C) (PSR ¶ 24), an additional 2 levels for his role in the offense pursuant to U.S.S.G. § 3B1.1(c) (PSR ¶ 26), and a three-3 level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b) (PSR ¶¶ 30-31), resulting in an adjusted offense level 24 in Criminal History Category I, with an advisory Sentencing Guidelines range of 51-63 months.  (PSR ¶ 32).  Probation's incorrect addition of 2 offense levels for "role" in the offense also disqualifies Mr. Neogra from receiving a 2-level reduction because of his status as a "Zero Point Offender" pursuant to U.S.S.G. § 4C1.1.  We think Probation's calculations are in error as discussed more fully below.  In our respectful view as set forth in the parties' Plea Agreement, Mr. Neogra's advisory sentencing Guidelines range should be 33-41 months based on an offense level 20 in Criminal History Category ("CHC') IV. (A copy of the parties' Plea Agreement is annexed hereto as Exhibit "4").

Based on an incorrect Guidelines "starting point," the Probation has recommended a sentence of 36 months imprisonment (*see* Sentencing Recommendation at pp. 1 and 3), a term

that, in our respectful view, exceeds what is sufficient in this case for this CHC I defendant and is far greater than necessary for Mr. Neogra.

This memorandum will address: 1) the error in Probation's Guidelines calculations, 2) why the PSR's recommendation is not appropriate and 3) why, the Court should impose a non-Guidelines sentence of time served and probation with an 18-month period of home confinement and community service as conditions. Such a sentence is sufficient, but not greater than necessary and would be appropriate considering the factors set forth in 18 U.S.C. § 3553(a).

**B. Objections to Probation's Guidelines Calculation**

We object to the Guidelines calculations in the PSR in two specific instances: first, the two offense level enhancement pursuant to U.S.S.G. § 3B1.1(e) for role in the offense conduct set out in PSR ¶¶ 12, 13 and 26; and second, the resultant omission of a two offense level reduction as a "Zero Point Offender" pursuant to U.S.S.G. § 4C1.1, which the role enhancement disqualifies Mr. Neogra from receiving. Both of these issues were addressed in the parties' pre-plea discussions and in the Plea Agreement in that no role enhancement was assessed and the two-level "Zero Point Offender" reduction was provided for. These judgments by the parties were arrived at after specific discussions regarding Mr. Neogra's role in the offense and application of the Zero Point Offender Reduction. While we recognize that the parties' Plea Agreement and the Guidelines calculations computed therein are neither binding on the Court nor on Probation (*see* Plea Agreement Exhibit "4" at ¶ 3), we do think that the calculations in the Plea Agreement reflect the parties' considered judgment that Mr. Neogra's appropriate Guidelines are those set forth in the parties' Plea Agreement.

At the outset, it should be noted that the characterization of Mr. Neogra as Mr. Stanzione's "second in command" widely overstates Mr. Neogra's role in the various business

11

entities by which Mr. Neogra was employed (Atronix, Atronix-P&M Joint Venture and Fire Alarm Electric).  Mr. Neogra's role in these companies, was quite limited in that he rarely was in the office and conducted much of his work from his home or out in the field.  Moreover, Mr. Neogra was responsible for project management, fire alarm engineering, application and design, and the technical engineering side of the work, i.e., equipment compatibility, and the installation, repair, maintenance and servicing aspects of the business.  That work occupied almost all of his time.  While at times Mr. Neogra held paper titles within the companies, he wholly lacked and never exercised the authority and supervision that those titles might otherwise suggest he had. He was made Vice President in November, 2015 and later was made President in September, 2018 because someone, an officer of the Company, was required to sign the payment requests being submitted to the government agencies with which the companies had contracts.  As the PSR noted at ¶ 13, Mr. Neogra did not exercise control or decision-making authority over Mr. Stanzione.  He also did not exercise managerial or supervisory authority over Mr. Stanzione's family members who prepared the false payment requests.  The only time Mr. Neogra was in the offices was once per month, or on a rare occasion, twice per month, when he came into the office to sign payment requisitions.  And even on those occasions, his work activities were limited to signing the payment requisitions.  That is not to say that he was unaware that the payment requests were false and inflated.  He did and that was the basis for his acknowledgment of guilt and his guilty plea.  But he had no managerial or supervisory authority over the fraud activity. His focus largely was on doing what needed to be done to effectuate the actual engineering work in the field, i.e., ordering parts, receiving parts, scheduling engineering work  and seeing it completed, and communicating with the various City agencies regarding work and payments.

Specifically, Mr. Neogra did not direct employees to design websites and logos for shell companies. *See* PSR ¶¶ 12, 13 and 14. To the extent he may have followed up on directions previously provided or directed by Mr. Stanzione, that may have been possible, but Mr. Neogra was not the source of any "directions." So too, regarding what were called "cut sheets," any overall directions in that regard came from Mr. Stanzione. Again, that is not to say that Mr. Neogra was unaware that false documentation was being used to support inflated payment requests. He has never denied being aware of that and with that acknowledgment still signed off on false payment requests. But he was not a manager or supervisor in the fraud activities. Just the opposite is true. Outside of his work organizing the project managers and field technicians and the engineering aspects of the business, he plainly was a follower. Most of the preparation of the false and inflated payment requests was done either by Mr. Stanzione or by personnel whom Mr. Stanzione had placed in certain positions, often people in Mr. Stanzione's family.

If one follows the money, Mr. Neogra's lack of authority and control over others becomes clear. Mr. Neogra received his salary, in his highest year, approximately $135,200. Many years he went without any raise and, when a raise happened, it was determined by Mr. Stanzione. Further, once money came into Firealarm Electric for payment by City agencies, whoever had been installed by Mr. Stanzione to run things would transfer the money out as Mr. Stanzione directed. Mr. Neogra was not consulted on these issues. Mr. Neogra had no control over money; he was not a signatory on any company bank account and he never signed a single check in the years that he nominally was made Vice President and later President, in 2015 and 2018, respectively. As such, to the extent Probation has come to a different conclusion, we think the considered overall judgment of both the Government and defense counsel that a role

13

enhancement should not be assessed, as reflected in the parties' Plea Agreement, is more persuasive on the overall facts of this case.

There is an expression in baseball where the fielder catches a ground ball and throws it to the first baseman and the batter running to first base reaches first base at the exact same moment that the first baseman catches the ball thrown by the fielder.  It says, "The tie goes to the runner." In this case, Mr. Neogra is the runner.  While we do not think the issue is nearly that close, the parties' considered judgment reflected in the Plea Agreement that a role enhancement, for whatever reason, is not warranted in this case, should prevail.  To the extent Probation views this as a closer question, then the "tie" still should go to Mr. Neogra.

Accordingly, we believe that the Plea Agreement has it right.  Mr. Neogra should not receive the two offense level role enhancement and should receive the two offense level reduction as a Zero Point Offender.  This results in a significant reduction in Mr. Neogra's Guidelines "starting point," from 51-63 months (based on a n offense level 24 in CHC I) to 33-41 months (based on an offense level 20 in CHC I), which, in our respectful view, impacts the just sentence to be imposed in this case.  In that regard, while far from sentence determinative, a correct "starting point" is essential, *see Rita v. United States*, 551 U.S. 338, 347-348, 351 (2007), before consideration of the § 3553(a) factors applicable in a particular case. [1]

### C.    The Guidelines Are Advisory And Only One Factor To Be Considered By The Court

We start with the obvious.  Whatever determination the Court makes regarding the Guidelines applicable to Mr. Neogra, as everyone is aware, the Sentencing Guidelines no longer

---

[1]  We also take this opportunity to comment on the arrest noted at PSR ¶ 34, forty-eight years ago when Mr. Neogra was seventeen years old.  Mr. Neogra was not the driver of the vehicle and he was not in possession of burglary tools.  Mr. Neogra was a passenger in a vehicle and was unaware that it had been stolen.

are mandatory.[2]  The Court should consider whatever Guidelines range it determines is

applicable as only one factor in determining William Neogra's sentence.  *Kimbrough v. United

States*, 552 U.S. 85, 101, 128 S.Ct. 558 (2007).  The Supreme Court's decision in Booker/Fanfan

requires sentencing courts to treat the Guidelines as but one of a number of sentencing factors set

forth in 18 U.S.C. § 3553(a).  As the Supreme Court held, the now revised Sentencing Reform

Act ("SRA")

> requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.
> § 3553(a)(4) (Supp. 2004), but it permits the courts to tailor the sentence
> in light of other statutory concerns as well, *see* § 3553(a).

*Booker*, 543 U.S. at 245, 125 S. Ct. at 757.

Our view further is that the Guidelines are entitled to weight no greater than that afforded

to the other factors listed in § 3553(a).  Any approach that automatically gives heavy weight to

the Guidelines range comes perilously close to the mandatory regime found to be

unconstitutionally infirm in Booker.

Judge Scalia explained this point in his dissent from Booker's remedial holding:

> [L]ogic compels the conclusion that the sentencing judge, after
> considering the recited factors (including the [G]uidelines), has full
> discretion, as full as what he possessed before the Act was passed, to
> sentence anywhere within the statutory range.  If the majority thought
> otherwise - if it thought the Guidelines not only had to be 'considered'
> (as the amputated statute requires) but had generally to be followed - its
> opinion would surely say so.

*Booker*, 543 U.S. at 305-06, 125 S. Ct. at 791 (Scalia, J., dissenting in part).  Likewise, if the

remedial majority thought that the Guidelines had to be given "heavy weight," its opinion would

have said so.  The remedial majority clearly understood that giving any special weight to the

Guidelines range relative to the other § 3553(a) factors would violate the Sixth Amendment.  As

---

[2] The sentence this Court imposes on William Neogra is subject to appellate review only for
"unreasonableness".  *United States v. Booker*, 543 U.S. 220, 261, 125 S. Ct. 738 (2005)

Justice Scalia observed in his concurring opinion in *Kimbrough*, 552 U.S. at 114, 128 S. Ct. at 577, there can be no "thumb on the scales" in favor of Guidelines sentences. There is no presumption as to the reasonableness of the Guidelines sentencing ranges. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596-97 (2007). *See also Nelson v. United States*, 555 U.S. 350, 351, 129 S. Ct. 890 (2009). As such, in each case a court must make an "individualized assessment" of the appropriate sentence "based on the facts presented" and the factors detailed in § 3553(a). *Kimbrough*, 552 U.S. at 114, 128 S. Ct. at 577. *See also Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) (Sifton, J.) (the "Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a.)."). Judge Sifton based his holding in *Simon* on three important considerations: first, the SRA does not "distinguish between the weight to be given to any of the factors;" second, "the greater the weight given to the Guidelines, the closer the Court draws to committing the act that *Booker* forbids - a *de facto* mandatory Guidelines Sentence based on facts found by a preponderance of evidence by a judge;" and third, Judge Sifton recognized that there is "tension, if not conflict" between the SRA and the Guidelines which direct a sentencing court to impose a sentence sufficient, but not greater than necessary. *Simon*, 361 F. Supp. 2d at 40.

In sum, as the Court is no doubt aware, in every case, a sentencing court must now consider all of the § 3553(a) factors, not just the Guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing and a judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all circumstances. Further, as one district judge has noted, "the Guidelines may be tempered by compassion." *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001) (Hellerstein, J.).

16

Additionally, Judges "may vary [from the Guidelines ranges] based solely on policy considerations, including, disagreements with the Guidelines," *Kimbrough*, 552 U.S. at 101-02, 128 S. Ct. at 570 (internal quotations marks omitted). *Spears v. United States*, 555 U.S. 261, 264-67, 129 S. Ct. 840, 843-44 (2009). Whether a judge may draw any useful advice from a guideline depends first on whether the Sentencing Commission in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109-11, 128 S. Ct. at 575. As described in *Rita v. United States* 551 U.S. 338, 127 S. Ct. 2456 (2007). The exercise of this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita*, 551 U.S. at 349-51, 127 S. Ct. 2464-65. Where, as here, with respect to § 2B1.1, a guideline that was not developed based on this "empirical data and national experience" pre-guidelines, it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-11, 128 S. Ct. at 575. *See also Spears*, 555 U.S. at 264-67, 129 S. Ct. at 843-44 (2009).[3] Although it does not appear

---

[3] The court's ability to impose a non-guidelines sentence based solely on a policy disagreement with a guideline itself applies to all guidelines not just the crack guidelines at issue in *Kimbrough* and *Spears*. *See Cunningham v. California*, 549 U.S. 270 (2007), where the Court recognized that the ability of judges to sentence outside the guidelines range based solely on general policy objectives, without any fact finding anchor, is necessary to avoid a Sixth Amendment violation. *Id.* at 279-81. In *Rita,* the Court held that because guidelines may not be presumed reasonable at sentencing, sentencing judges are permitted to find that the guidelines sentence itself fails properly to reflect § 3553(a) considerations, that the guidelines reflect an unsound judgment, or that the guidelines do not generally treat certain defendant characteristics in the proper way. 551 U.S. at 350-51, 127 S. Ct. 2465, 2468. In *Kimbrough*, the Court reiterated that a district judge may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps the case warrants a different sentence regardless," 552 U.S. at 570, 128 S. Ct. at 102, quoting *Rita*, 551 U.S. at 351, 127 S. Ct. at 2465, and, thus, "courts may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." 552 U.S. at 570, 128 S. Ct. at 102. While *Kimbrough* and *Gall* referred to the drug

that Guideline § 2.B1.1 was based on any congressional directive, even were it to have been so derived courts are free to disagree with any of the guidelines, including guidelines that do emanate from congressional actions.  See *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2009)(en banc), cert. denied, 129 S. Ct. 2735 (2009).  *See also United States v. Seval*, 2008 WL 4376826 (2d Cir. Sept. 25, 2008); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

Moreover, the Guidelines as presently constituted contain anomalies in their treatment of offenses which undermine their utility and permit a sentencing court to disagree with a particular guideline on a policy basis.  In this case, the PSR places William Neogra at a total Offense Level "27" and at an Adjusted Offense Level "24," before an acceptance of responsibility reduction. However, in what is a non-violent crime by a CHC I offender with zero Criminal History points, Mr. Neogra is treated in the PSR's Guidelines calculation as, or more harshly than someone convicted of: Demanding or Receiving Ransom Money under U.S.S.G. § 2A4.2 (Offense Level 23); Narcotics offenses under U.S.S.G. § 2D1.1 of significant quantiles of narcotics (Offense Level 26); Arson by use of explosives under U.S.S.G. § 2K1.4 (Offense Level 24); Smuggling under U.S.S.G. § 2L1.1 (Offense Level 25); Statutory Rape under U.S.S.G. § 2A3.2 (Offense Level 18); Robbery under U.S.S.G. § 2B3.1 (Offense Level 20); Robbery with Permanent or Life Threatening Bodily Injury under U.S.S.G. § 2B3.1(b)(3)(D) (Offense Level 18); Extortion under U.S.S.G. § 2B3.2(a) (Offense Level 18); Trafficking in Material Sexually Exploitive of a Minor (Offense Level 18).  These are just some examples.  The somewhat arbitrary nature of the

---

guidelines generally as not having been based on empirical data, *see Kimbrough*,  552 U.S. at 109-10, 127 S. Ct. at 575; *Gall*,  552 U.S. at 534, 127 S. Ct. at 594 n.2, *Rita* made clear that judges may disagree with any guideline.  *See* 551 U.S. at 356,127 S. Ct. at 2465, 2468.  Indeed sentencing courts must be free to disagree with the guidelines on the basis of policy so that judges can play their role in providing information to the Sentencing Commission so that "the Guidelines [can] constructively evolve over time."  *Rita*, 551 U.S. at 109-10, 127 S. Ct. at 2469.

differing offense levels when juxtaposed against each other and against the PSR's Guidelines calculations in this case for this offender, we submit respectfully, are not supported by empirical data, simply make no sense and should be eschewed on policy grounds.

Indeed, the § 2B1.1 Guideline "loss" table used in this case was not based on pre-Guidelines practice and the Commission appears to have adopted the "loss table" without any empirical basis. At its inception, this Guideline called for sentences higher than pre-Guidelines sentences and the increases in the loss tables over the years also were done without any empirical basis. The Sentencing Commission's Supplementary Report on the Initial Sentencing Guidelines and Policy Statements[4] discussed the lack of agreement regarding an underlying philosophy for the Guidelines. As stated in a fifteen-year "look-back" and follow-up study, the Sentencing Commissions noted that:

> "the Commission, either on its own initiative or in response to congressional actions, established guideline ranges that were significantly more severe than past practice"

for the most frequently sentenced offenses in the federal courts, including white collar offenses.[5] Further, in estimating past practice sentencing levels, the Sentencing Commission in promulgating the initial guidelines did not include probationary sentences. *See Supplementary Report* at 24. This was no small omission, since nearly 40% of all defendants were sentenced to straight probation in 1984.[6] Our point, in any event, simply is that the "loss" table in this case

---

[4] *U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987) (hereinafter "*Supplementary Report*"), available at http://www.fd.org/pdf_lib/Supplementary%20Report.pdf.

[5] *U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 47 (2004 ) (hereinafter "*Fifteen Year Review*"), citing *Supplementary Report*.

[6] *Fifteen Year Review* at 43.

produces an overly harsh result and that imposition of a Guidelines sentence in this case is a sentence "greater than necessary" to achieve the aims of sentencing.

Written in another time and for a different purpose, the observation that "Not everything that can be counted counts, and not everything that counts can be counted," we think has a particular application to this case. While there is some debate as to the statement's author,[7] regardless of who was the author, the quote is instructive. A man's life and the measure of that life cannot simply be reduced to a box on a sentencing grid propelled by an equally uncaring slot on a "loss" table.

As the Supreme Court reminded over 25 years ago, the "uniform and constant . . . tradition for the sentencing judge {is} to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensure." *Koon v. United States*, 518 U.S. 81, 113 (1996). *See also United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008). It has been observed that sentencing is not an exact science. Rather it is a "fluid and dynamic process." *Irizarry v. United States*, 553 U.S. 708, 128 S.Ct. 2198 (2008). Its aim should be to impose a sentence that is reasonable and fair and just given the facts of a particular case and the facts relative to the particular person

---

[7] While some have credited Albert Einstein for this quote, the Sociologist Bruce Cameron is more reliably credited as the author of this quote, which first appeared in his 1963 textbook, *Informal Sociology: A Casual Introduction to Sociological Thinking*. *See* https://www.google.com/search?q=when+and+where+did+einstein+say+%22Not+everything+th at+can+be+counted+counts%2C+and+not+everything+that+counts+can+be+counted&authuser= 0&aep=21&udm=50&utm_source=google&utm_campaign=aim_aware&utm_content=oo-seaport-10215&mtid=jpbRaOboH8KgiLMPsoCFuQ4&mstk=AUtExfD_9tBudNI4ejkHx8iarWYjkwpU F7y9o8LKJONtACStTk5ENW6nrgzK69m8n8waUC77nRHUha4nsDbbYsbxGsxPDBos6rYKL aID4zN7h_2By8f2CarSlhgUeooo4XKCxOSaeTZRqf5NEbBRujBIGtnJkHVy2h75_w_Zr-OetgBp4MC_tA06nHzB7psiJAIcCXlLUjkHVOd17o6MQZnoeExj2ARMAnNXimQjg2G9fMIx 7CGGj7-SsbsgroA0Jd1d5PLWpg8zbTcEG0WcVH8pbwUp9c9C5S9tCDzSf88ZuPKVGFZSk9TYONQt PWcVKJMe6xKlmdO6inUSjvnXniwgP03npdeIui-Uw&csuir=1

being sentenced.  The overarching goal is to fashion a sentence that is sufficient, but not greater than necessary.

Further, the Court should not follow the Guidelines range set forth in the PSR because it is not in line with the factors set forth in 18 U.S.C. § 3553(a), which require the court only to impose a sentence "sufficient, but not greater than necessary."  *See Gall*, 522 U.S. at 39 (stating a sentencing court "may not presume that the Guidelines range is reasonable.").  The Court must consider the individual defendant, William Neogra, when imposing his sentence.  *See Gall*, 522 U.S. at 50; *Kimbrough*, 522 U.S. at 108.  This Court has the discretion under *Booker*, 543 U.S. 220; *Gall*, 552 U.S. at 38; and *Kimbrough*, 552 U.S. 85, were it so inclined, to sentence William Neogra even to a sentence of probation and even if the Sentencing Guidelines do not provide for it because of the advisory nature of the Guidelines.  For all of the reasons discussed herein, we are requesting a non-Guidelines sentence of time served, supervision and home confinement for a period of 18 months.

As we discuss more fully herein, the Court should not impose the calculated Guidelines sentence because:  (1) a non-Guidelines sentence for this offender is sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2)[8]; (2) the factors that the Court must consider, which are set forth in § 3553(a), support a non-Guidelines sentence sought herein; (3) the PSR's Guidelines calculation and recommendation fails to give appropriate consideration to the § 3553(a) factors; and (4) the PSR's Guidelines calculations are in error.

First, a non-Guidelines sentence is sufficient, but not greater than necessary because: (1) William Neogra has been punished by the passage of several years since the offense conduct

---

[8] The corollary to this argument is that the calculated range is far greater than necessary to promote the goals of sentencing and is out of balance with the purposes of sentencing set forth in the statute

ended and will be punished sufficiently should the Court not sentence him to time in prison by the collateral consequences of his conviction; (2) studies show that certainty, not severity, of punishment affords adequate deterrence to criminal conduct; (3) William Neogra will have no opportunity to repeat the conduct of which he was convicted; and (4) William Neogra is 65 years old, a husband and father, son and brother,  and is in Criminal History Category I with zero criminal history points.  These all are factors that result in a low rate of recidivism, which mitigate strongly here in favor of lenity, and are important factors not considered in the Guidelines' calculus.

Second, the § 3553(a) factors that the Court must consider all support a non-Guidelines sentence for the following reasons: (1) William Neogra's characteristics indicate that at this time in his life he has a low risk of recidivism, (2) William Neogra already has lost a good deal, (3) alternatives to a prison sentence exist and should be used in cases such as this when, as here, they are "sufficient," (4) the PSR's Guidelines calculation is a product of a guideline not based on empirical data and the loss factor drives up the offense level disproportionately, and (5) adherence to the Guidelines calculation in imposing sentence, given the statistics set forth in the Sentencing Commissions Source Book for offenses of the type at issue here, would result in a sentence disparate from many similarly situated defendants in similar cases.

Third, as noted, the PSR's Guidelines calculus is the product of an erroneously high Guidelines starting point, and fails to give appropriate consideration to the § 3553(a) factors.

**D.    A Non-Guidelines Sentence Of Probation With Conditions Is Sufficient, But Not Greater Than Necessary, To Comply With The Purposes Set Forth In Section 3553(a)(2).**

As noted, Section 3553(a) requires a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 specifies that the court must consider:

> the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

These purposes in this case all would be satisfied by a non-Guidelines sentence not greater than one year and one day.

Generally, speaking, "[d]eterrence, incapacitation and rehabilitation are prospective and societal – each looks forward and asks:  What amount and kind of punishment will help make society safe?  In contrast, retribution imposes punishment based on moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?"  *United States v. Cole*, 662 F. Supp.2d 632, 637 (N.D.Ohio 2008).  In this case, each of these purposes can be served by a non-Guidelines sentence.  The answer to the first question is that society is safe and need have no fear of William Neogra.  So too, a lengthy period of incarceration is not needed to restore William Neogra to moral standing in the community.  He continues to try to support his family's emotional, physical and financial needs.  Incarceration will not alter those answers.

1. **A non-Guidelines sentence is sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense.**

In this case the calculated Guidelines range runs contrary to the statutory mandate that the:

> Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . .

28 U.S.C. § 994(j). As a non-violent person in CHC 1, a non-Guidelines sentence is appropriate and sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. In fact, a sentence of lengthy incarceration may undercut respect for the law. *See Gall*, 552 U.S. at 54, 128 S. Ct. at 594 ("'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing'") (quoting the district court).

The period of time William Neogra has been involved in this matter, i.e., investigation, indictment, arrest, plea and now sentencing – all have had a dramatic effect on his life and have had a great impact on him and his family. Each day is filled with doubt, and fear about the future. At times it is very difficult to bear. Apart from these very personal collateral consequences of his conviction, William Neogra, will endure a myriad number of collateral consequences. In *United States v. Nesbeth*, 188 F. Supp.3d 179, 184-85 (E.D.N.Y. 2016), District Judge Frederic Block found that "federal law imposes nearly 1,200 collateral consequences for convictions . . . ." Judge Block concluded that the broad range of "collateral consequences serves no useful function other than to further punish criminal defendants" after serving court imposed sentences. *Id.* at 180. As a result of his conviction, William Neogra, for

24

example, may be rendered ineligible for a variety of items such as federal health care benefits and government loans.

Former Attorney General Eric Holder, stated at the annual meeting of the American Bar Association's House of Delegates on August 12, 2013, that the federal prison population has increased by 800 percent since 1980 and called this widespread incarceration "both ineffective and unsustainable," particularly in light of the "human and moral costs that are impossible to calculate." Former Attorney General Holder's comments are available at http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. Bill Keller, in a New York Times opinion piece, also highlighted the substantial monetary and emotional costs to the public and the individuals of unnecessary and overly lengthy terms of incarceration. *See* Bill Keller, "America on Probation," The New York Times, Monday, January 27, 2014, pg. A19, col. 1-5.

**2.    A non-guidelines sentence of probation with conditions would not encourage criminal conduct.**

Imposing the PSR's calculated Guidelines sentence in this case would have little, if any, bearing on deterrence. Empirical research shows no relationship between sentence length and deterrence. In a pre-Guideline study of specific deterrence, which involved white collar offenders (presumably among the most rational), no difference in deterrence was found as a result of sentence severity, including between probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). *See also* Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences

generally is capable of enhancing deterrent effects.").[9]  "There is generally no significant

association between perceptions of punishment levels and actual levels . . . implying that

increases in punishment levels do not routinely reduce crime through general deterrence

mechanisms.  Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43

Criminology 623 (2005).  *See also United States v. Lawrence*, 254 F. Supp.3d 441 (E.D.N.Y.

2017) (Weinstein J.), where the Court heard testimony from several experts in the field and

reached the same conclusion that punishment levels do not reduce crime through general

deterrence.

In addition to the ineffectiveness of overly lengthy imprisonment on deterrence, an over-

emphasis on general deterrence poses the ethical problem of punishing one person to promote

deterrence of others. "Judicial punishment can never be administered merely as a means for

promoting another good either with regard to the criminal himself or to civil society, but must in

all cases be imposed only because the individual on whom it is inflicted has committed a crime.

For one man ought never to be dealt with merely as a means subservient to the purpose of

another."  Immanuel Kant, *The Science of Right* 195 (W. Hastie trans., 1790).[10]  General

deterrence simply is not a good reason for a lengthy prison term.  *See Col*e, 662 F. Supp.2d at

---

[9]  A summary of the Von Hirsch report is available at
http://members.lycos.uk/awnet/SENTENCE.pdf

[10]  The practical problem of the high cost of imprisoning an individual also is a consideration
militating in favor of a non-Guidelines sentence of probation with conditions.  In fiscal year
2023, the annual cost of imprisoning an individual was $44,090.00 per year.  *See* Federal
Register available at https://www.federalregister.gov/documents/2024/12/06/2024-28743/annual-
determination-of-average-cost-of-incarceration-fee-coif.  In comparison, in Fiscal Year 2024, it
costs $4,742.00 for supervision.  Placing an offender in a Bureau of Prisons institution was
roughly ten times the cost of placing the same offender under post-conviction supervision by a
federal probation officer.  United States Courts: *The Public Costs Of Supervision Verses
Detention,* published on June 5, 2025 available at https://www.uscourts.gov/data-news/judiciary-
news/2025/06/05/public-costs-supervision-versus-detention.

637.  Taken together, these considerations support our view that a sentence of time served, supervision with an 18-month home confinement would be sufficient in this case.

Lastly, to the extent there is need for general, as opposed to specific, deterrence, that need has long been satisfied by the publicity attendant to this case.  Given all that he already has lost, it would hardly be a blow to any concepts of general deterrence were William Neogra to be given the non-Guidelines sentence noted herein.

### 3.    A sentence not requiring incarceration is sufficient to protect the public from future wrongdoing by William Neogra

#### a.    Lack of means.

In imposing a sentence on William Neogra that protects the public from any future criminal conduct, the Court should consider that he will not have any opportunity to engage in the conduct which underlies this case.  Given his conviction, and his age and health issues, Mr. Neogra will have nothing further to do with municipal contracts of any kind.  Because of his age and his various infirmities, his work career is over.  He survives on his social security income.  Further, inasmuch as William Neogra has no intention of committing a future crime and has no means to do so – the public need have no concerns regarding William Neogra.

#### b.    Low risk of recidivism.

The facts of William Neogra's age are indicative of the documented statistical conclusion that he has a very low risk of recidivism.  The Court should consider this low risk of recidivism in assessing the need to protect the public from any future crimes by William Neogra.  *See United States v. Ruiz*, No. 04 CR.1146-03, 2006 WL 1311982 at *4 (S.D.N.Y. May 10, 2006) (noting courts have imposed non-guidelines sentences for defendants based on age due to markedly reduced recidivism risk); *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming district court's sentence of a fine and five years of probation rather than 10 to

16 months of imprisonment under the guidelines based in part on defendant's low risk of recidivism); *United States v. Hoffmann*, 2006 WL 3390736 at *6 (D. Neb, Nov. 22, 2006) (No. 08:05 Cr. 282) (because of defendant's low risk of recidivism, court sentenced defendant to three years of probation instead of 8 to 14 months under guidelines).

The Sentencing Commission has published studies concluding that the Guidelines overstate the risk of recidivism and that, on the contrary, "there is no correlation between recidivism and [a] guidelines' offense level." *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) available at http://www.ussc.gov/publicat/Recidivism_General.pdf ("Measuring Recidivism"); *Recidivism and the First Offender* (May 2004) available at http://ussc.gov/publicat/Recidivism_General.pdf ("First Offender"); *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4 2005) available at http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.  The Sentencing Commission itself has found that "[t]here is no correlation between recidivism and guidelines' offense levels and whether an offender has a low or high guidelines offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected.  The Guidelines offense level is not intended or designed to predict recidivism." *See Measuring Recidivism* at 15, http://www.ussc.gov/publicat/Recidivism_General.pdf.  Conversely, the Commission's own studies have shown that the following factors, consideration of which the Guidelines either prohibit or discourage, *do* correlate with reduced recidivism:

● Age:  Recidivism rates decline consistently as age increases.  Measuring Recidivism at 12; Mr. Neogra is 65 and not likely to commit any crime in the future;

- Education:  Recidivism rates decline with increased education level, with college graduates having the lowest rate of recidivism.  *Id*. at 12; Mr. Neogra has a college degree;

- Family:  Recidivism rates decline for defendants who have families.  *Id*.  Mr. Neogra has family ties and family support;

- Abstinence from Drug Use:  Recidivism rates are lower for offenders who did not use illegal drugs for one year prior to the offense.  *Id*. at 13.  Mr. Neogra has had no drug use history;

- Non-Violent Offenders:  Offenders sentenced under the fraud guidelines are the least likely to repeat criminal activity.  *Id*.;

- Additionally, Mr. Neogra's health issues further make it less likely that he will commit any crime in the future.

Taking these factors in turn, William Neogra is 65 years old.  He has an education.  He has a supportive family.  The offenses for which he stands convicted are non-violent.  He has had no prior criminal history.  An analysis of these factors demonstrates that William Neogra has an extremely low risk of recidivism and thus, a non-Guidelines sentence is appropriate and a lengthy sentence is not called for or necessary to protect the public and prevent future criminal activity.  Indeed, Congress has directed that, in considering whether and to what extent imprisonment is appropriate based on the § 3553(a) factors, a sentencing judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."  *See* 18 U.S.C. § 3582.

**E.**    **The Remaining Section 3553(a) Factors, Which the Court Must Consider, Support a Non-Guidelines Sentence**

Section 3553(a) requires a sentencing court to consider additional factors including the nature and circumstances of the offense, the history and characteristics of the defendant, the

kinds of sentences available, the range established by the Sentencing Guidelines, any pertinent policy statement from the Sentencing Commission, the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims. Consideration of these additional factors also supports a non-Guidelines sentence.

**1.    The nature and circumstances of the offense support a non-Guidelines sentence for** William Neogra.

We are not unmindful of the fact that William Neogra stands convicted of serious offenses. Nonetheless, in our respectful view, consideration of all of the circumstances of the offense supports a non-Guidelines sentence.

Regarding the offense conduct itself, we have addressed this *supra* at pp. 3-5, 11-14, but a few added points ought to be made, not because they lesson Mr. Neogra's conviction but because they add some context to it:

       i) Unlike his co-defendant and others, Mr. Neogra did not reap millions of dollars from the offense conduct. He was a salaried employee who earned approximately $135,200, in his highest year**.** We are not suggesting that this is not a "good income," but it is not the large sums of money received by his co-defendant and spread around to members of his co-defendant's family and others;

       ii) Mr. Neogra did what he was told as a salaried employee, albeit with the knowledge that he was participating in a fraud.

**2.    The history and characteristics of William Neogra  support a non-Guidelines sentence.**

Section 3553(1) also requires a sentencing court to consider the history and characteristics of the defendant when imposing a sentence. In imposing sentence, we ask the court to consider William Neogra's life, his age, his health issues and his family ties and

circumstances which demonstrate that incarceration in this case at this time is neither necessary nor warranted.  We previously have described the difficult circumstances which have marked Mr. Neogra's life.

> a.    *The offense of conviction is not reflective of William Neogra's life*.

In 28 U.S.C. § 994(j), Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment" in cases of non-violent first-offenders.  Mr. Neogra is a Criminal History Category I offender with no criminal history points.  Courts have varied from the calculated Guidelines range for defendants who were first-time offenders and who had led otherwise decent lives.  *See United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (affirming sentence of probation and home confinement for wire fraud conviction despite 18-24 month guideline range where offense was "isolated mistake" in upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (upholding 6 level departure where defendant was "law abiding citizen who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 at *5 (S.D.N.Y. June 5, 2008) (imposing time served where first-time offender had history of long marriage, working many jobs to provide for six children, and being actively involved with his children's education). Outside of this offense for which he is about to be sentenced, William Neogra has led an honorable and decent life, defined by love of family and guided by community and kindness towards others.  Further, the offense conduct will not be reflective of William Neogra's future life.  He truly has learned a painful lesson.  In his personal statement, annexed hereto as Exhibit "1," William Neogra has addressed his own prior shortcomings and his life's story.  Along with the letters of support from family and friends (Exhibits "2" and "3"), they demonstrate other qualities of Mr. Neogra which are worthy of consideration at this time in his life.

>     b.    *William Neogra's family circumstances lend support for*
>           *a non-Guidelines sentence.*

In determining an appropriate sentence, the court should considering William Neogra's family circumstances.[11]  Under *Booker*, even if not extraordinary, family circumstances are a factor which may militate against lengthy incarceration and which a court may rely on in considering the § 3553(a) factors to ameliorate in particular cases the harshness of the Guidelines and grant a downward variance.  *See United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (remanding case because advanced age, military service, health issues, and employment history could warrant variance under § 3553(a)).

Consideration of William Neogra's family circumstances, combined with other considerations, supports a non-Guidelines sentence.  As discussed previously, William Neogra is 65 years old.  The letters from his wife and other family members and friends attest to Mr. Neogra's love of his family and their love for him, and his wife's dependence on him (her "life does not work without him").  We already have commented generally on many of these letters, s*ee also* Exhibit "2" at pp. 5-10, *supra*.  Friends have voiced similar strong feelings of support for Mr. Neogra.  (Exhibit "3").  These factors, combined with other characteristics of William Neogra, support imposition of a non-Guidelines sentence and supervision.  Indeed, the Sentencing Guidelines both pre and post *Booker* allow for a variance from a Guidelines sentence on the basis of family ties and responsibilities.  *See Davis*, 2008 WL 2329290, at *2 (imposing

---

[11]  Courts must consider all § 3553(a) factors, including those that the Guidelines reject, ignore, or demand to an extraordinary degree.  *Booker*, 543 U.S. at 220; *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Pursuant to 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

time served where defendant was married 15 years, devoted to education of 6 children, and incarceration would deny them care and guidance needed).[12]   Courts also have granted departures and/or variances from guidelines sentences after considering community ties/contributions.  *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming 6 level downward departure where defendant served in Marine Corps' reserves 20 years ago, and performed exceptional public service and good works); *United States v. Greene*, 249 F. Supp.2d 262 (S.D.N.Y. 2003) (granting seven level departure in tax case where defendant performed extraordinary charitable good works and had extraordinary family circumstances); *United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007) (affirming non-guidelines sentence in part because record showed defendant was kind and caring with support of family, friends and colleagues).  Under § 3553(a), the circumstances need not be extraordinary to merit a court's favorable consideration and a downward variance from the Guidelines.  We make this point only to show that in consideration of what is an appropriate sentence, the Court may rightfully give consideration to the nature of Mr. Neogra's current family life, the support he gives to, and which he receives from, members of his family and close friends, and the simple everyday kindnesses he does for and to others and to the broader community in which he lives.

---

[12]  *See also Howe*, 543 F.3d at 137 (affirming sentence of probation and home confinement for conviction of wire fraud where district court based variance in part on defendant's devotion to his family); *United States v. Antonakopoulos*, 399 F.3d 68, 82 (1st Cir. 2005) (district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care available); *United States v. Dominguez*, 296 F.3d 192, 194 (3d Cir. 2002) (district court erred in saying it could not depart 4 levels for bank fraud defendant who lived with elderly parents who were physically and financially dependent on defendant); *United States v. Munoz-Nava*, 524 F.3d 1137, 1141-42 (10th Cir. 2008) (court varied from guideline sentence in part because defendant was sole supporter of eight-year old son and elderly parents); *United States v. Prisel*, No. 07-3281, 2008 WL 4899451 at *8 (6th Cir. Nov. 13, 2008) (unpub) (court varied from guideline range where defendant worked from home and had a dependent wife with whom he had a joint mortgage).

Mr. Neogra's own health issues also must be factored in to a determination of what is a just sentence in the case. As noted in the PSR at ¶ 50, and in his Personal Statement (Exhibit "1"), Mr. Neogra suffers from several physical injuries and ailments. They include: hypertension, lumbar spine degeneration, osteoarthritis in both hips and diabetic polyneuropathy in his feet (which makes even walking difficult and causes him to fall), kidney disease and heart issues (abnormal EKG). He is on medication for all of these conditions.

**3.    Considering the kinds of sentences available, this Court should impose a non-Guidelines sentence on William Neogra.**

Section 3553(a)(3) requires sentencing courts to consider the kinds of sentences available when imposing a sentence, even if under the Guidelines the only permitted or encouraged sentence would be prison. *See Gall*, 552 U.S. at 602 & n. 11, 594 (finding court did not abuse discretion in imposing three years of probation where guidelines calculated range of 30-37 months). Congress also has encouraged non-Guidelines sentences whenever warranted. *See* Senate Report No. 98-225 at 59 & n. 531 (stating "if an offense does not warrant imprisonment for some purpose of sentencing, the committee would expect that such a defendant would be placed on probation."); *see also* 28 U.S.C. § 994(j) (which encourages non-custodial sentences for non-violent first-offenders). Further, as noted by the Court in *Gall*, "[o]f fenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." 552 U.S. at 48-49, 128 S.C. at 595-596. Most probationers also are often subject to special conditions which further restricts their liberty, *Id.*, as we are suggesting that the Court impose here, i.e., home confinement and community service. Additionally, Probation in the PSR at ¶ 72 notes that Mr. Neogra is statutorily eligible for probation (18 U.S.C. § 3561(c)(1) with the proviso that unless extraordinary circumstances exist the Court must impose a fine, restitution or community service. (18 U.S.C. § 3563(a)(2)). While the PSR at ¶ 73 also notes that pursuant to

U.S.S.G. § 5B1.1, comment (n. 2) Mr. Neogra is not eligible for probation under the Guidelines, given that the Guidelines are advisory and given the Court's discussion in *Gall*, there is no prohibition on a sentence of probation with special conditions of home confinement and community service.  Further, the applicable statutory scheme will require imposition of a mandatory restitution order/judgment.  *See also* Plea Agreement, Exhibit "4" at ¶ 6.

     **4.**    **After considering the Guidelines sentencing range in this case, the Court should vary from the Sentencing Guidelines and impose a non-Guidelines sentence on William Neogra.**

*a.  The Guidelines Generally*

As noted above, the Supreme Court has made clear that sentencing courts must treat the Sentencing Guidelines as only one of the number of sentencing factors set forth in 18 U.S.C. § 3553(a).  *See Booker*, 543 U.S. at 220.  There is no presumption of reasonableness of the Guidelines range, *Gall*, 552 U.S. at 49, and there can be no "thumb on the scales" in favor of a Guidelines sentence.  *Kimbrough*, 552 U.S. at 577.  *See also Simon*, 361 F. Supp.2d at 40 (the "Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a).")

In this case, the Guidelines emphasis on a "loss" metric does not square with the other § 3553(a) factors.  For that reason (and others), as noted above, Judges "may vary [from the calculated guideline range] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 707 (internal quotations omitted).  We note specifically that the "loss" Guidelines were not developed by the Sentencing Commission based upon "empirical data and national experience," and thus it is not an abuse of discretion for a court to conclude that the § 2B1.1 "loss" guideline results in a sentence "greater than necessary" to achieve the purposes set forth in § 3553(a).  *See Kimbrough*, 552 U.S. at 575; *see also Spears*,

555 U.S. at 264-66 (2009).  The loss Guidelines used in this case, although revised over time, simply were not based on pre-Guidelines practice and the Commission adopted the "loss" table contained within the Guidelines with no empirical basis.

Further, "loss" based Guidelines have been widely criticized by judges and legal scholars. As stated in one opinion, the Guidelines "in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd,* 301 Fed. Appx. 93 (2d Cir. 2008), citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)).  *See also* Derek R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentence Regime in White-Collar Criminal Case*, 59 Duke L.J. 1001, 1025 (2010) ("The Guidelines fail to achieve justice in white-collar criminal cases.  Their sentencing recommendations are irrationally high and, due to the Guidelines' overemphasis on the loss calculation, fail to accurately reflect a defendant's culpability").  Courts have found Guidelines increases based on loss in fraud cases to defy common sense.  *See Adelson*, 441 F. Supp. 2d at 509 and 512 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss;" Judge Rakoff also criticized the "harm that guidelines calculations can visit on human beings if not combined with common sense");[13] *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-428 (S.D.N.Y. 2004) (reasoning amount of loss is often "a kind of accident" and therefore "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence".  *See also United States v. Parris*, 573 F. Supp. 2d

---

[13]  In *Adelson*, a case where the Government calculated the "actual loss" of $260 million or a statutory maximum of 85 years, Judge Rakoff held that the Guidelines placed an "inordinate emphasis on loss calculations" in fraud cases and were "wildly off-base."  441 F. Supp.2d at 512, 515.  Judge Rakoff sentenced Alelson to 42 months imprisonment.  *Id.* at 512.

744 (E.D.N.Y. 2008) (recognizing Guidelines range of 360 months to life resulting from increases caused by Guidelines amendments passed after highly publicized frauds such as Enron defied common sense in that case and instead imposed a 60 months sentence); *see also* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008) ("since Booker, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of § 3553(a) that judges impose sentences 'sufficient but not greater than necessary' to comply with its objectives").

In *United States v. Gupta*, 904 F. Supp.2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014), a stock fraud case involving insider trading, Judge Rakoff, repeated his concerns, expressed earlier in *Adelson*, with the application of the Guidelines' "loss" table and its disproportionate and unrealistic effect on the measure of an appropriate sentence in that case. In that case the defendant was a financial titan near the pinnacle of global economic wealth and power. The facts as to Mr. Neogra are far removed from those relating to *Gupta,* but, in words which are appropriate here, Judge Rakoff stated:

> "Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."

*Id.* at 350.

Judge Rakoff went on to conclude that in focusing largely on the amount of monetary gain or loss occasioned by an offense, the Sentencing Commission "effectively ignored the statutory requirements that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Id.* at 351. Rather than impose the enormous sentence called for by the Guidelines, Judge Rakoff sentenced to two years incarceration.

What Judge Rakoff called the "irrationality of this approach," is present to a certain degree here and causes what, in Judge Rakoff's view, created "in the name of uniformity, a sentencing disparity of the most unreasonable kind." *Id.* at 351. That is particularly so, where, as here, 16 of the 27 offense levels determined by the PSR to be applicable are driven by the "loss" Table. According to Judge Rakoff, "this is a very rough surrogate" for determining an appropriate sentence. *Id.* We think that Judge Rakoff's analysis of the place of the § 2B1.1 table, also used here, hits the mark.

Other judges and scholars appear to share this view and have expressed a like dissatisfaction with the Guidelines applicable in white collar cases and the § 2B1.1 Guidelines "loss" Table which disproportionately affects the Guidelines offense level. Indeed, some have termed the Sentencing Guidelines "fundamentally broken" in high-loss cases. Frank O. Bowman, III, "Comment on Proposed Amendments to Economic Crime Guideline, § 2B.1.1" (Feb. 19, 2015) at p. 2 (citing remarks of Judge Patti B. Saris, Jan. 9, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/Remarks.pdf). *See also* Robert J. Anello and Richard F. Albert, "Rise of ABA Task Force's 'Shadow Sentencing Guidelines,'" N.Y.L.J. April 5, 2016.

38

One judge recently noted that "the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table." *United States v. Faibish*, 12 Cr. 265 (E.D.N.Y. March 10, 2016) Sentencing Tr. Doc. No. 271 at p. 23 (Judge Vitaliano). In that case Judge Vitaliano sentenced a fraud defendant with Guidelines of life and with a "cap" of 80 years (based on the maximum sentence possible by stacking counts after the defendant's conviction at trial) to a sentence of 63 months. *Id.* at 54. The "Shadow Sentencing" article cited above noted also that in *United States v. Litvak*, 3:13 Cr. 19 (D. Conn. July 23, 2014), Chief Judge Janet C. Hall sentenced a defendant to 24 months for securities fraud where the Guidelines recommendation in the PSR was 108-135 months. *Id.*, *see* Sentencing Transcript, Doc. No. 298 at 135-136, 141-47, 158.[14]

Other courts in the Second Circuit have not hesitated to give sentences far below the advisory Guidelines' range. For example, in *United States v. Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008), the Court gave five defendants sentences ranging from one year and one day to four years for their role in a $500 million fraud, notwithstanding an advisory Guidelines range of life in prison. In *United States v. Parris*, 573 F. Supp.2d 744, 745 (E.D.N.Y. 2008), the Court imposed a 60-month sentence in a securities fraud case notwithstanding an

---

[14] In *Litvak*, Judge Hall expressed the concern that the Guidelines "loss" table "overwhelms" all the other factors to be considered. As Judge Hall noted further, "I think 60 percent of the total offense is attributable to just sheer dollars without any regard for any other characteristics of the offense. Therefore, I don't find the Guidelines helpful at all." *See* Sentencing Tr. Doc. No. 298 at p. 142.

*Litvak* also has an interesting subsequent history. On appeal, Litvak's conviction was reversed in part, vacated in part and remanded. *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015). On remand, Litvak was retried and again convicted on the securities fraud count. On May 2, 2017, Judge Hall again sentenced Litvak, *inter alia*, to 24 months imprisonment. Doc. No. 542.

advisory Guidelines range of 360 months to life.  In *United States v. Treacy*, No. 08 Cr. 366 (S.D.N.Y. 2009), the court calculated a guidelines range of 121 to 151 months based upon profits a corporate executive had gained from backdated stock options, but imposed a non-guidelines sentence of two years based upon the § 3553 factors.

In *United States v. Hundley*, 02 Cr. 441 (S.D.N.Y. 2005), four defendants were convicted at trial of conspiracy, bank fraud (involving a loss of approximately $100 million) and tax fraud (for evading approximately $29 million in taxes).  Additionally, two of the defendants were convicted of making false statements and one was convicted of perjury.  Judge Loretta A. Preska sentenced the defendants well below their Guidelines ranges.  For example, the defendant convicted of making false statements, but not perjury, faced a guidelines range of 78 to 97 months; he was sentenced to prison for one year and one day.  *Id.*

In sum, the advisory Guidelines provides a framework that is of limited value in assessing culpability.  Accordingly, the Court should exercise its discretion to fashion a non-Guidelines sentence, considering all of the§ 3553(a) factors and "make an individualized assessment based on the facts presented."  *Gall*, 522 U.S. at 50.

Further, where, as here, as in many fraud cases, the "loss" calculation is over $2 million and additional enhancements are added, there necessarily is an overlapping of those enhancements.  *See United States v. Lauerson*, 362 F.3d 160 (2d Cir. 2004); *United States v. Lauerson*, 348 F.3d 329 (2d Cir. 2003); *United States v. Jackson*, 364 F.3d 22 (2d Cir. 2003).  Any time the loss amount is high, it fundamentally is so because of enhancements already baked into the loss figure.  As the Court stated in *United States v. Dorvee*, 604 F.3d 84, 96 (2d Cir. 2010), "adherence to the Guidelines" can lead to a result "fundamentally incompatible with §

3553(a)," based on "sentencing enhancements that are all but inherent to the crime of conviction."

*b. Specific Objections to the PSR's Guidelines Calculations*

As stated in *Rita,* 551 U.S. at 347-348, the district court should begin all sentencing proceedings by correctly calculating the applicable sentencing range. An incorrect calculation interferes with the court's duty to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing as outlined in 18 U.S.C. § 3553(a)(2). We have addressed our specific objections to the PSR earlier in this submission. *See* pp. 11-14 *supra.*

### 5. <u>Imposing a non-Guidelines Sentence on William Neogra will not result in unwarranted sentencing disparities.</u>

We recognize that every person who comes before the Court is different in many ways related both to the offense conduct and to a person's life. In our respectful view, in this case, imposition of a non-Guidelines sentence on William Neogra will not create any sentencing disparities. In fact, imposing a Guidelines sentence would likely result in a sentencing disparity given the sentences imposed both nationwide and locally on other defendants.

Generally, during fiscal year 2023 in the Second Circuit, 72.3% of all sentences were below Guidelines sentences. *Id.*, Table 30. In the Eastern District of New York in 2023, 77.5% of all defendants received a below Guidelines sentence. *Id.*, Table 30. In fraud cases, the statistics are not much different. Nationally, 60.3% of all sentences in fraud cases were below Guidelines sentences. *Id.*, Table 31. In cases where the operative Guideline was § 2B1.1, as here, 62.4% of all nationwide sentences were below Guidelines sentences. *Id.* Table 32. A non-Guidelines sentence is this case would not be inconsistent with these statistics.[15]

---

[15]  These statistics were garnered from the United States Sentencing Commission 2023 Sourcebook. *See* 2023 Sourcebook of Federal Sentencing Statistics, available

Furthermore, defendants convicted of similar conduct may vary in culpability, risk of recidivism, dangerousness and other variations that judges must now take into account. *See Kimbrough*, 552 U.S. at 108 ("some departures from uniformity were a necessary cost of the remedy we adopted"). William Neogra compares favorably on each of these touchstones. *See also United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant").

Nor, we submit, would a non-Guidelines sentence here cause any disparity among defendants in this case. Mr. Neogra's co-defendant, Walter Stanzione and his family members, who received large financial rewards from the offense, and according to Mr. Stanzione's plea agreement, a four-level leadership enhancement, was far more culpable than Mr. Neogra and has a far higher advisory sentencing range. Moreover, other culpable members of Mr. Stanzione's family were not prosecuted.

Again, we recognize that each person is different in culpability and in life's circumstances and personal characteristics. Our point simply is that a non-Guidelines sentence of probation, home confinement for 18-months and community service for William Neogra would not be out of line or create any sentencing disparity either nationally or locally, or in this case. Further, regarding the Guidelines, at least since *Booker* (and probably before), courts have recognized the disjunct between sentences prescribed under the Guidelines and the requirement of 18 U.S.C. § 3553(a) that judges impose sentences "sufficient, but not greater than necessary," to comply with the sections objectives. *See, e.g., Parris*, 573 F. Supp.2d at 745. *See also United*

at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023_Sourcebook.pdf

*States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) ("While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding the diverse frailties of humankind [.] . . . what it is like to be in trouble and in pain").

### 6.    The Need To Provide Restitution

The need to provide restitution is a factor slightly militating in favor of a non-Guidelines sentence and also mitigates against incarceration.  *See United States v. Menyweather*, 447 F3d 625, 634 (9th Cir. 2006).  *United States v. Peterson*, 363 F. Supp.2d 1060, 1061-62 (E.D. Wisc. 2005).  Here, significant restitution is being sought.  A societally productive William Neogra would advance an ability to make restitution, if not monetarily, at least by community service.

### 7.    No Fine Should Be Imposed

Given that Mr. Neogra will have a substantial restitution obligation and has court appointed counsel, we submit most respectfully that no fine should be imposed.  (*See* PSR Sentencing Recommendation at p. 1).

### CONCLUSION

William Neogra is a complex individual, like most people.  He has many redeeming qualities and there is much more to him than the narrative of his offense conduct.  He has been described as kind, caring, generous, a good friend and loving.  Those narratives also help to define his humanity.

So where does all of this leave William Neogra?  That his family already has suffered greatly cannot be disputed seriously.  His wife is apprehensive of her own future.  William Neogra has led a decent (not perfect) life.  He has been charitable to others.  He has health issues that will make incarceration far more difficult for him than for most offenders.  All of this must count for something.  We think it does.  Under 18 U.S.C. § 3553(a) a non-Guidelines sentence in

this case is supported by the facts relevant to the case and to William Neogra.  Based on all

relevant facts and factors, we respectfully submit that Justice can and ought to be tempered by

mercy in this case for Mr. Neogra.

      For all of the foregoing reasons, William Neogra respectfully requests, on the facts of this

case as to him and considering all of the sentencing factors which the Court must consider, that

the Court impose a non-Guidelines sentence of time served and probation, with special

conditions of 18-months home confinement and community service.  Such a sentence will be

sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. §

3553(a).  William Neogra has learned a painful lesson and taken it to heart.

Dated:  September 23, 2025
       New York, New York

                            Respectfully submitted,
                            Doar Rieck Kaley & Mack
                            _____/s/_____
                            John F. Kaley
                            217 Broadway, Suite 707
                            New York, New York 10007
                            Tel: (212) 619-3730
                            *Attorneys for Defendant William Neogra*

To:    Eric Paulsen, Esq.
       Michael Gilbaldi, Esq.
       Assistant United States Attorneys
       (Via e-mail & ECF filing)

       Ms. Erica Vest
       U.S. Probation Officer
       (Via e-mail & ECF filing)

**EXHIBIT 1**

**September 22, 2025**

**William C. Neogra**
24391 Kent Drive
Millsboro, DE 19966

**Honorable Rachel P. Kovner**
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE:    **United States v. William Neogra**
       **Docket No 23-Cr.-482 (RPK)**

Dear Judge Kovner:

    I would like to offer you this letter to explain to you how I became involved in this offense and to express my sincere and humble apology for my actions in this case. I will regret for the rest of my life my lack of courage to say, "No," when I should have known better. I do want you to know that I take and accept full responsibility for my actions. I blame no one, but myself. Sometimes, life throws us difficulties. They come fast and from out of nowhere. They can make you weak, if you let them, and they can cause you to do things you might otherwise not have done. With the benefit of hindsight, I had multiple crises going on in my life that caused me to lose sight of what was right and to justify what was wrong or at least ignore it and I put my head in the sand.

    In 2008, when my son was about fifteen (he is thirty-two now), he and three friends were run over by a speeding vehicle. They were just pedestrians crossing a street when hit. One of my son's friends was killed; my son and the other two were hurt, physically, emotionally and psychologically. While my son's physical injuries healed, the emotional and psychological damage has lingered to this day. Only recently, has my son obtained a part-time job. He literally spent the intervening years playing video games, awake most of the night and sleeping most of the day. The aftermath of the accident and the family difficulties it caused led to a deterioration of my marriage. Notwithstanding my best and honest efforts to navigate the marital issues which arose, I was not able to save our marriage. A very difficult and emotionally draining divorce followed. I became immersed in these life issues and lost focus. At that time in my life, I wasn't thinking clearly, all of which was complicated by my fear of losing my job. I know what I did was wrong, and I let it go on for far too long. At this point, I can only ask Your Honor for mercy.

    If I may tell you a little about myself. I have always considered myself a good person, caring and sincere. I am liked by many and loved by my family and friends. I have learned compassion, forgiveness and empathy. I always look to see the good in people and I also have learned to become

1

a good listener.  People in trouble often find themselves secluded and alone. In a way, I think that is what happened to me.  I believe that everyone makes mistakes.  It's what you do afterward that matters. Please allow me to continue to do good in this world.

I have suffered many harsh and some violent trials and tribulations but I never sought reprisal. In consideration of these matters, I have focused on doing good. Helping those who are in need and require help.

Being kind, selfless and honest and providing comfort and strength, I have always come to the aid of others in need, acknowledging people that they are valued and to be there for them. That could just be giving an ear to listen, providing a meal or even a place to sleep in our home.  Being worthy, above all, and to help and serve others.  I have always chosen to spend and invest my time in the service of others, to try to support others and to inspire them. I hope you will allow me to continue to do so.

People need encouragement. They need support. They need a shoulder to cry on. They need to be heard. I'm a good listener and enjoy the smiles of gratitude when I've been of help to people.

I live simply! I never asked for anything nor did I ever want much.  A wife, family, children, a home to live in, a car to drive and food on the table. I never lived a spectacular or lavish life. I was humble and never needed much. Just love, some happy times and to be able to care for my family.

I am certainly not perfect.  I've made many mistakes, but I am hopeful that you will take a chance on me.

GOD tells me to be strong and brave.  Even with my belief in Him I am scared to death.  Now, I am physically and emotionally drained. I have always tried to be strong but now I'm terrified, filled with trepidation because I am unaware of my fate.  Faced with the unknown, I am filled with apprehension.

I have always tried to be the strong one and that was OK. I got my strength from my father. But now, I do not feel strong. I feel weak, not in control.

I was fortunate to have met my current wife, Tracy. We met later in life. I say it was fate. Both of us healing, working on ourselves. Not being sure what the future held and the universe said, here you go. Heal together. Love each other and grow together.  A few years after we met, I asked her to marry me.  She is my soul mate. I'm told that they only come once in a lifetime.  I'm so grateful to have met her. She shakes things up and shows me true love.  She stands up for me like no one else ever has. She has seen things in me I didn't know existed, the best of me. She adores me as I do her. She pushes me to be the best version of myself that I can be.  She loves me like no other has. She is always my one saving grace.  I made a commitment to her to take care of her.  I understand that I must face the consequences of my actions.  I am hopeful you will allow me to do both, fulfill my sentence and continue to take care of my wife.

2

Please look at me as a person beyond my flaws.  The narrative of my life is not defined by my offense.   I am hoping for a second chance. I understand that there are consequences for my mistake.  My fate is in your hands so I ask you, please, be lenient when sentencing me.

In closing, with humility, I offer my sincere apology to you, the court and and the agencies that suffered loss on account of my conduct and I ask for mercy.

With all respect,

William C. Neogra

3

# EXHIBIT 2

July 30, 2025

**Tracy Howarth**
24391 Kent Drive
Millsboro, DE 19966

**Honorable Rachel P. Kovner**
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE:     United States v. William Neogra
        Docket No 23-Cr.-482 (RPK)

Dear Judge Kovner:

My name is Tracy Howarth-Neogra. I am aware that my husband William Neogra has pleaded guilty to this offence. I am writing to you in connection with his sentencing.

I have known Bill for eight years and have been married for the last three.

Bill has always shown confidence and an attention to detail with all he does. His devotion to family is outstanding. No matter what day or time, his family knows that they can always count on him.

Bill shows kindness and loyalty to his family and friends. They have such admiration for him with all he has helped them with.

Recently, a lightning strike damaged electrical outlets, thermostats and lighting at his brother's home, and his two neighbors Debra & Scott Willis and Lou Giardino. Bill did not hesitate at 9:30pm that evening and ran over to help them. He was able to get their needs taken care of, especially their HVAC systems knowing the evening temperature was over ninety (90) degrees.

I know that my husband has learned his lesson from what happened in this case. He is everything to me and my life does not work without him in it. I am pleading with you to find it in your heart to give him the least sentence possible. Please give us the chance to get his life back on track.

I know that Bill with continue to make positive contributions to family, friends and our community.

Thank you for your attention.

Regards,

Tracy Howarth-Neogra

September 8, 2025

**The Honorable Rachel P. Kovner**
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn New York 11201

Dear Honorable Rachel P. Kovner,

My name is Victoria Holihan, and I am writing to respectfully provide a character reference for my father, William Neogra, in connection with his upcoming sentencing. I understand that he has pleaded guilty, and I am not writing to excuse his actions, but rather to share a perspective on the person I have known him to be throughout my life.

My father has always been a calm and steady presence. During my childhood, especially through difficult periods such as my parents' divorce, he provided a safe and supportive space for me. His ability to remain composed under stress and to offer stability during uncertain times was something I came to rely on.

He worked tirelessly to support our family financially, making sure that we had everything we needed—and often more. His strong work ethic and sense of responsibility were values he demonstrated daily. Despite whatever personal or professional challenges he faced, he remained committed to our well-being.

While I recognize the seriousness of his offense, I hope this letter helps provide some context about his character outside of this situation. My father is someone who has always tried to take care of those around him, and I believe he has the capacity for growth, accountability, and positive contribution moving forward.

Thank you for considering this letter as part of your evaluation.

Sincerely,

Victoria Holihan
17 Cindy Lane, Apt. 314
Ocean, NJ 07712
victoria.neogra@yahoo.com
908-770-7545

June 22. 2025
The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Honorable Judge Kovner,

My name is Robert Neogra, William (bill) Neogra's brother. When asked to write to you I thought it would be an easy task, sitting here with pen in hand I find it quite difficult. I was told that this letter might give you a better understanding of my brother. I love and believe in him because he has always been the responsible one, the good one. Growing up he loved to play music (He was musically inclined, I was not) He played Saxophone, and bass guitar. I know all the great bands from the 1970s thanks to him. My brother taught me how to dance, how to dress nice how to be respectful and how to mature. This made me a better person. My brother was a friend to me. Throughout our lives he has been compassionate and always put others first. (like my mom) As a grown up he

was a good husband and loving father. He has a love for repairing small engines and anything electrical. I share this with you, but whats truly amazing that even today my brother will try to lend a helping hand when asked. He is not a healthy person and doesn't get around to good but that never stops him. My brother and I have shared a lifetime of memories. Born and raised in Brooklyn N.Y. to staten island to New Jersey to Delaware. A person like my brother is a rare find, So I stayed close. We helped each other through lifes ups and downs. A brothers love is one thing, but we share a friendship. My brother Bill has always been a person that demonstrates commitment to helping others, Compassion and always acting Selflessly. His life was one that leaned towards growth and bettering himself. This incident does not reflect my brothers character. He has always respected the law. (my dad was a twenty year veteran with N.Y.P.D.) I believe My brother Bill deserves the opportunity for leniency and the chance to Continue making a positive impact on those around him.

Thank you for your time and consideration

Sincerely,

Robert Neogra

Sat, Jun 28, 2025 at 1:11 PM

Dear Honorable Rachel P. Kovner

My name is LeeAnn Neogra, Sister in law of William Neogra. I am writing to provide a character reference for William Neogra whom I have known for over fifty years. William and I went to school together in our early years. i remember his love of music and playing instruments, He was alway in a band. Later in life when I became a family member of Williams, We shared countless years of vacations, Holidays and birthday celebrations, I watched him raise his children, He was a loving, caring and dedicated husband and father. Furthermore I have observed william fulfill responsibilities with diligence and dedication, Whether it was in a professional capacity or personal commitment.

Whenever I needed any advice or a helping hand, Bill was always there for me.

Your Honor, I hope you will consider leniency for Mr. Neogra, So he can continue to make a positive impact in our lives and those around him.

Thank you for your time and consideration.

Sincerely,
LeeAnn Neogra

Cody Hagan
16 Maybury Court
Staten Island NY 10306
8/1/2025

Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kovner,

My name is Cody Hagan. I am writing this letter to respectfully request leniency in the sentencing of my stepfather, William Neagra.

In the time that I've known Mr Neagra, he has consistently shown himself to be a kind, respectful, and compassionate person. One of the most meaningful examples of his character is the way he treats my mother with incredible patience, care, and respect. He never hesitated to lend a hand or offer support when she needed it. That care meant a great deal to both of us. I learned very early after meeting him that his level of compassion for my mother wasn't just reserved for her. He genuinely cared

about and respected others.

There was also a period in my life when I was struggling and trying to get back on my feet. Mr. Neogra barely knew me at the time, yet he opened his home to me without hesitation. He never asked me for rent or anything in return. He simply wanted to help. That generosity gave me the stability I needed to move forward during a very difficult time, and I will always be grateful for it.

I understand he has pleaded guilty and I don't mean to minimize the severity of his crime. I just want you to know the side of him that I've grown to love and respect. He's the kind of person who supports others and treats people with dignity and compassion. He's the kind of person who admits when they're wrong and will go out of his way to make things right. I truly believe he has the potential to redeem himself and can lead an honest life while making a positive impact on others as he has for my wife, my mother, and I.

Thank you for taking the time to read my letter and for considering my words

Respectfully,
Cody Hagen

Dear Honorable Rachel P. Kovner

My name is LeeAnn Neogra, Sister in law of William Neogra. i am writing to provide a character reference for William Neogra whom I have known for over fifty years. William and I went to school together in our early years. I remember his love of music and playing instruments, He was alway in a band. Later in life when I became a family member of Williams, We shared countless years of vacations, Holidays and birthday celebrations. I watched him raise his children, He was a loving, caring and dedicated husband and father. Furthermore I have observed william fulfill responsibilities with diligence and dedication, Whether it was in a professional capacity or personal commitment.
Whenever I needed any advice or a helping hand, Bill was always there for me.

Your Honor, I hope you will consider leniency for Mr. Neogra, So he can continue to make a positive impact in our lives and those around him.
Thank you for your time and consideration.

Sincerely,
LeeAnn Neogra

Angela Kistra
116 maybury court
Steuen Island, NY 10306
8/1/2025

Honorable Rachel P. Kovner
united states District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Honorable Judge Kovner,

I am writing to ask for leniency on behalf of my mother-in-law's husband, William Neogra.

He is one of the most sincere and accountable people I know. When he realizes he had been wrong about something, no matter how small, he does his research, owns up to it, and personally reaches out to make it right. That's just the kind of man he is.

He treats others with respect, shows up for his family, and lives his life

with integrity. Watching how well he
and my mother-in-law, Tracy care
for one another has been nothing
short of inspiring. He is grounded,
kind, and genuinely wants to do good.

Please know that this situation
does not define who he is. I believe
deeply that he is still someone with so
much to offer, especially to the people
who love and count on him.

Thank you for taking the time to
consider his character.

Sincerely,
Angela Kisha

# EXHIBIT 3

Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Honorable Judge Kovner,

I have been a neighbor of William Neogra since they moved to Millsboro in 2021. I understand that he is to be sentenced for something that happened in New York. I ask that you be lenient to him as he has been an exemplary neighbor and friend.

He was a great help to me in many ways after he moved into the Woodlands of Millsboro and became my neighbor. I had trouble with my microwave and he tried to fix it, but since it was under warrantee he recommended that I go ahead with requesting a replacement. When the replacement arrived, he helped my son-in-law in installing it.

He has also helped me move several heavy pieces of furniture, mowed my lawn when my family couldn't, and has always refused any payment for his help. He has also helped other members of the community in many other ways.

Both he and his wife, Tracy, have hosted several picnics and dinners at their home for several of the neighbors. They have also opened their home to a neighbor who was going through a divorce and had nowhere to live and was going to live in his car.

In addition, Bill and Tracy have contributed to some of the charities of my organization, the Order of the Eastern Star (a fraternal organization). He supports our dinners and charity events throughout Delaware.

I find Bill to be a valuable member of the community. He is devoted to his family and has become very close friends of my daughter and son-in-law, often coming to dinner or joining them at a restaurant for dinner.

Again, I ask the impose the lightest sentence allowed by law and thank you for your consideration in this matter.

Sincerely,

*Terese J Hensel*

Terese J. Hensel
409 Williams Street
Seaford. DE 19973

June 24, 2025

Judge Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kovner,

My name is Mr. William Hoesten and I am writing this letter in reference to Mr. William Neogra. I have had the privilege of knowing Mr. Neogra for the last 5 years, and in that time my wife and I and Mr. Neogra and his wife have become very close friends. We met when Mr. Neogra and his wife purchase their home next door to my Mother-in-Law. In the last 5 years Mr. Neogra has been a very good friend. In my opinion, I believe Mr. Neogra to be an honest and kind man.

We have trusted him to care for our dog whenever we go away on vacation. We have invited them dinner at our house several times over the last 5 years and, likewise, they have invited us for dinner at their house. We have also dined out with them several times. He accompanied us to a charity dinner last March..

Mr Neogra has helped us with fixing the light to our basement and would lend a helping hand whenever we have needed him. He also helped my mother- in-law with installing a new microwave oven.

In conclusion Mr Neogra is a good man and consideration should be given in giving him a lighter sentence on his charge of participating in a conspiracy to commit fraud.

Sincerely,

William Hoesten

July 1, 2025

Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Kovner,

I am writing on behalf of my dear friend, William Neogra. He is awaiting his sentencing on a charge of participating in a conspiracy to commit fraud. I believe him to be an honest, kind, and humble man, and the utmost consideration should be taken into given him as lenient of a sentence as possible.

I met Bill (Mr Neogra) about 5 years ago when he and his wife, Tracy, moved into the house next to my mother. In the last 5 years we (my husband and I) have become close friends with Bill and his wife. Bill has always been there to lend a helping hand without wanting anything in exchange for his help. He helped us with fixing our light in the hallway to our basement and helped my mother with installing her microwave just to name a few.

Bill also watches our dog for us whenever we go away. Our dog really loves him too. Bill has a heart of gold and even took in a neighbor for a short time when the neighbor had no place to go. Bill is a good family man and loves whenever his family or close friends can come to visit. He meets with his brother for coffee at least once a week.

My husband and I have had the pleasure of dining with Bill and his wife on many occasions. They have invited us to their house for several meals and, likewise, we have an invited them to several meals at our house. We have also gone to restaurants with them, as well as shopping with them. Additionally, Bill and his wife attended a charity event with my husband and I, in which the proceeds went to benefit Service Dogs.

Overall, in the past 5 years that I have known Bill, I have only known him to be a kind and gentle man. He always has a smile on his face and sees the good in others. Bill has never spoken poorly of another person and is always willing to help with whatever you need. Please allow Bill to continue to make positive contributions to his family and his community by giving him the lightest sentence possible, as he is a good man.

Sincerely,

Dawn R Hoesten

Honorable Rachel P. Kovner                                  Eric Jensen
United States District. Judge                               11 Elderberry St.
Eastern District of New York                                Georgetown, DE 19947
225 Cadman Plaza East
Brooklyn, New York 11201


Re: United States v. William Neogra
    Docket No. 23-Cr.-482 (RPK)


Dear Judge Kovner,

        Hello, my name is Eric Jensen. I am writing you with regards to the case of Mr. William Neogra. I
was Mr. Neogra's neighbor from June of 2021 when he and his wife moved into the home directly next
to mine until December of 2023 when I moved from the neighborhood.

        Upon Mr. Neogra's arrival into our community we became instant friends. To be honest, I am a very
private person by nature, and do not accept friends into my inner circle very easily. But, from the first
time I met Mr. Neogra I sincerely felt "at ease" with him. My first impression was that he was a very
genuine and caring human being. And, over the following years my initial impression would prove to be
absolutely correct.

        Living next door to Mr. Neogra, I had contact with him nearly every day in one capacity or another,
and I can honestly say Mr. Neogra and his wife are the best neighbors I have ever had. With that said, I
was truly shocked when Mr. Neogra asked me to write a letter on his behalf, and the reason for it. I
absolute can not imagine Mr. Neogra being involved with something dishonest, much less illegal. I
understand Mr. Neogra has pleaded guilty in this case, therefor he believes there is sufficient evidence to
prove his guilt. The only way I can comprehend Mr. Neogra being involved in an illegal activity is that
he truly did not know, realize, or understand the extent to which the activity was occurring.

        My experience and interactions with Mr. Neogra over the years have always been of a positive
nature. He is, and always has been more than willing to share his time, energy, and knowledge with his
friends and family. Anytime I have asked a favor or requested Mr. Neogra's help with something, he has
always been there for me, without fail. Some of the things Mr. Neogra has assisted me with include,
helping me install new brakes and rotors on my vehicle. He has also assisted me with the installation of
two air conditioning compressors that needed to be replaced in my vehicle. He helped me rebuild an
outboard boat motor that I was having trouble with. He also helped me repair my pool filter and install
new pool stairs, helped replace a door in my home, and cleared snow from my driveway with his snow
blower without me even asking. There are many other small things that he has assisted me with that
might seem trivial in this context, but the point is, he was always there for me.

My wife and I separated in July of 2023, and without hesitation, Mr. Neogra and his wife stepped in and allowed me to share their home with them for two weeks until I could secure more permanent accommodations. They welcomed me into their home with open arms during an extremely difficult time in my life. The following months proved to be very turbulent for me with numerous court appearances concerning my personal property that my wife refused to return to me. Mr. Neogra accompanied me to every court appearance, not to testify on my behalf, but as a friend, encouraging me, and providing moral support. THAT is the Bill Neogra I know!

A judge ultimately ordered my wife to allow me back into my former home to retrieve my personal belongings. Mr. Neogra was there, without fail to help me, both physically and emotionally. I had lived in that home for over 20 years, so you can imagine how difficult that must have been for me. I don't know if I would have been able to navigate through that difficult time in my life if it wasn't for Mr. Neogra and his wife's help and support. Not only did Mr. Neogra help me retrieve my belongings, he also allowed me to store those items at his home until I got settled into my new residence.

I have also witnessed Mr. Neogra generously give of his time to other neighbors and his community. He donated his time and energy to repair and repaint the community "Woodlands of Millsboro" sign at the entrance to our development at his own expense. Mr. Neogra is always willing to help any of his friends, and most importantly, his family. Mr. Neogra and his wife are the happiest, most devoted couple I know. It is very obvious to see how truly in love they are. If they were ever separated, for any reason, they would both be devastated.

I consider Mr. Neogra a true friend! And, on a higher level, he is a genuine, kind, decent, and empathetic human being. He is an asset to his friends, family, community, and society in general.

No human is perfect. We all make mistakes from time to time. The difference between a good person and a "not so good" person is a good person learns from their mistakes and changes their behavior accordingly. Mr. Neogra is a genuinely good person, and I can guarantee he has learned from any mistakes he has made regarding this situation. I can't imagine how heavily this situation has weighed on Mr. Neogra over the past months. Please take that into consideration while making your decision on Mr. Neogra's future. He truly is a good person and does not pose a threat to anyone in any way.

Sincerely,

Honorable Rachel P. Kovner
United States District. Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  United States vs. William Neogra
     Docket No. 23-Cr.-48 (RPK)


Dear Judge Kovner,

I am writing to you concerning Mr. William (Bill) Neogra.  I understand he has pleaded guilty to a crime
and is awaiting sentencing.

I have known Bill and Tracy since they moved in the house across the street from me in June 2021.  Bill
is the most kindhearted and caring person I have ever met, and very willing to help anyone. He was a
great neighbor and is a good friend.  Since I am a single, older person, Bill was always willing to help
me out whenever he could.  We all became great friends.  He and Tracy accepted me like family, having
dinners with their families, celebrating birthdays, etc. He is a very devoted man to his wife and family,
and I know his sentencing will be very hard on everyone.  I know that he is very sorry and feels that he
has let his family down.  I truly hope he gets the most lenient sentencing possible.

He helped me with numerous projects, including a dining room light that needed to be replaced and a
kitchen faucet that I was having trouble with. I was visiting them one day, in their front yard, and a large
dog came out of no-where and attacked my little dog that was on a leash. Even though he has trouble
with severe arthritis, Bill jumped right in to save my dog, something I will never forget and will always
be grateful for.

I moved out of that community a year and a half ago, and again Bill gave me a lot of support.  He took
me to pick up a rental truck and followed me back home to make sure I got home safe, among many
other things.  He and Tracy were sad that I was moving but still supported me in whatever way they
could.  We have remained good friends even though I moved from Millsboro to Georgetown.  I can say
that Bill has been nothing but kind and considerate, not only to me, but to everyone he meets.  I am
proud to call him my friend.

Sincerely,

*Sharon Roberts*

Sharon Roberts
11 Elderberry Street
Georgetown, DE 19947

# EXHIBIT 4

RCH:EDP/MWG/EWS
F. #2018R00784

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

WILLIAM NEOGRA,

              Defendant.

- - - - - - - - - - - - - - - - - X

PLEA AGREEMENT

23 CR 482 (RPK)

        Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States

Attorney's Office for the Eastern District of New York (the "Office") and WILLIAM NEOGRA

agree to the following:

        1.     The defendant will plead guilty to the sole count of the above-captioned

indictment ("Indictment"), charging a violation of 18 U.S.C. § 1349. The count carries the

following statutory penalties:

                a.     Maximum term of imprisonment: 20 years
                      (18 U.S.C. §§ 1343, 1349).

                b.     Minimum term of imprisonment: 0 years
                      (18 U.S.C. §§ 1343, 1349).

                c.     Maximum supervised release term: 3 years, to follow any term of
                      imprisonment; if a condition of release is violated, the defendant
                      may be sentenced to up to 2 years without credit for pre-release
                      imprisonment or time previously served on post-release
                      supervision
                      (18 U.S.C. § 3583 (b) & (e)).

                d.     Maximum fine: Greater of $250,000, or twice the gross gain or
                      twice the gross loss
                      (18 U.S.C. § 3571(b)(2), (b)(3) and (d)).



COURT'S
EXHIBIT NO. 1
IDENTIFICATION/EVIDENCE
DKT. # 23cr 482
DATE: 03 25 2025

      e.    Restitution: In the full amount of each victim's losses as
             determined by the Court, and as set forth below in paragraphs 6
             through 11.
             (18 U.S.C. §§ 2259, 3663, 3663A and 3664).

      f.    $100 special assessment
             (18 U.S.C. § 3013).

2.      The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). The Office estimates the likely adjusted offense level under the Guidelines to be 23, which is predicated on the following Guidelines calculation:

|  | Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
|---|---|---|
| Plus: | Loss More than $1.5 Million (U.S.S.G. § 2B1.1(b)(1)(I)) | +16 |
| Plus: | Sophisticated Means (U.S.S.G. § 2B1.1(c)(10)(C)) | +2 |
| Less: | Zero Point Offender (U.S.S.G. § 4C1.1)) | -2 |
| Total: |  | 23 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 21 and a range of

2

imprisonment of 37 - 46 months, assuming that the defendant falls within Criminal History Category I. Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before March 2͞5͞, 2025 an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 20. This level carries a range of imprisonment of 33 - 41 months, assuming that the defendant falls within Criminal History Category I. The defendant stipulates to the above Guidelines calculation.

3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, (a) the conviction, (b) the incarceratory portion of the sentence in the event that the Court imposes a term of imprisonment of 46 months or below, (c) the duration of supervised release if it is less than or equal to the statutory maximum, or (d) any condition of supervised release about which the defendant has notice prior to sentencing and an opportunity to object. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. The defendant further waives the right to raise on appeal or on collateral review any argument that

3

(a) the statute to which the defendant is pleading guilty is unconstitutional and (b) the admitted conduct does not fall within the scope of the statute. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing. The defendant understands that he may be subject to removal as set forth in paragraph 13 below. Nevertheless, the defendant affirms that he wants to plead guilty and to waive his right to appeal as set forth at the beginning of this paragraph, even if the consequence is the defendant's automatic removal from the United States.

        5.     The Office agrees that no further criminal charges will be brought against the defendant for his participation in a scheme to defraud the New York City Department of Citywide Administrative Services, the New York City Department of Environmental Protection, the New York City Department of Education, and the New York City Department of Sanitation by making and causing others to make false and fraudulent representations concerning the repair, replacement, and maintenance of fire alarm systems in New York City buildings, between in or about 2009 and 2020, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq. Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations

4

under this agreement, including but not limited to moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above.

6.      Pursuant to 18 U.S.C. §§ 3663, 3663A and/or 3664, the defendant agrees to the entry of a restitution order, to be incorporated in the judgment, as provided in paragraph 1(e), above. The defendant understands that full restitution will be ordered regardless of the defendant's financial resources, and that an unanticipated amount of restitution will not serve as a ground to withdraw his guilty plea.

7.      The defendant further agrees: (a) to make full restitution, in the amount specified in the judgment, to all victims harmed by defendant's "relevant conduct," as defined by U.S.S.G. § 1B1.3, including conduct pertaining to any dismissed counts or uncharged conduct, and regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A; (b) that any monetary penalties imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in 18 U.S.C. § 3613; (c) that any schedule of payments imposed by the Court is merely a minimum schedule of payments and does not, in any way, limit other methods available to the United States to enforce or collect the judgment; (d) that, notwithstanding compliance with any Court-ordered payment schedule, the defendant shall participate in the Treasury Offset Program (TOP) in which any federal payment to which the defendant is otherwise entitled—such as an income tax refund or transfer of returned property—may be offset and applied to the defendant's federal debt; and (e) not to attempt to seek the discharge of any restitution obligation or monetary penalties, in whole or in part, in any present or future bankruptcy proceeding.

8.      To effect the collection of Court-ordered restitution and monetary penalties, the defendant further agrees: (a) within 20 days of execution of this plea agreement, to provide to

5

the Office—subject to the penalties associated with false statements, the obstruction of justice or perjury, including 18 U.S.C. § 1001—a full and accurate disclosure of his financial affairs by providing a financial statement, which shall, among other things, identify all assets owned or held directly or indirectly by the defendant, (b) to identify all assets valued at more than $5,000 that have been transferred to third parties since the commencement of the criminal activity and/or the date of arrest, including the location of the assets and the identity of the third parties, (c) to notify the Office before the defendant transfers any interest in property owned directly or indirectly by the defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations, and (d) submit updated financial statements to the Office—subject to the penalties specified above—on a yearly basis until the fine or restitution is paid in full or the liability terminates under 18 U.S.C. § 3613(b). See 18 U.S.C. §§ 3613, 3664(k) & (n). Such financial statements shall notify the Office of any interest in property obtained, directly or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation, after the execution of this agreement, and any other change in the defendant's economic circumstances.    Should litigation be required to collect payment of restitution, fines or special assessments, the United States may be entitled to recover an additional surcharge of 10 percent of the outstanding amount of debt pursuant to 28 U.S.C. § 3011.

9.    The defendant further agrees to grant the United States a wage assignment, liquidate assets, or complete any other tasks which will result in immediate payment in full, or payment in the shortest time in which full payment can be reasonably made, as required under 18 U.S.C. § 3572(d).  If the defendant is incarcerated, the defendant agrees to participate in the Bureau

6

of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

   10. Upon request of the Office, the defendant shall submit to the Office copies of financial information that the defendant submits to the Probation Department, and/or the Internal Revenue Service. The defendant agrees to execute an Internal Revenue Service Tax Information Authorization Form 8821, upon request of the Office, until all of defendant's criminal debts including, but not limited to, restitution, fines and special assessments, have been fully satisfied.

   11. The parties will jointly recommend that, as itemized above, the defendant's (a) compliance with any court-ordered payment schedule, (b) notification to the Office prior to the transfer of property, and (c) submission to the Office of updated financial statements, be made conditions of probation or supervised release. The defendant acknowledges that (a) his obligation to pay restitution is broader, including that the monetary penalties are due immediately and subject to immediate enforcement by the United States, and (b) all his restitution obligations will extend until the fine or restitution is paid in full or the liability terminates under 18 U.S.C. § 3613(b), which may be later than the date on which probation or supervised release ends.

   12. This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

   13. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement supersedes all prior

promises, agreements or conditions between the parties. To become effective, this agreement must

be signed by all signatories listed below.

Dated: Brooklyn, New York
      March 25 , 2025

> JOHN J. DURHAM
> United States Attorney
> Eastern District of New York

By:        _____

> Erik D. Paulsen
> Michael W. Gibaldi
> Eric Silverberg
> Assistant United States Attorneys

Approved by:

_____
Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

_____ 03/18/2025
WILLIAM NEOGRA
Defendant

Approved by:

_____
John F. Kaley, Esq.
Counsel to Defendant

8