

U.S. Department of Justice

United States Attorney
Eastern District of New York

RCH:EDP/MWG/EWS  
F. #2018R00784

271 Cadman Plaza East
Brooklyn, New York 11201

September 30, 2025

By ECF & E-Mail

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. William Neogra
     Criminal Docket No. 23-482 (RPK)

Dear Judge Kovner:

  The government respectfully submits this letter in advance of defendant William Neogra's sentencing on October 7, 2025. On March 25, 2025, the defendant pleaded guilty to wire fraud conspiracy, in violation of 18 U.S.C. § 1349. For the reasons set forth below, the government submits that a term of imprisonment between 33 and 41 months would serve the legitimate purposes of sentencing, including punishing the defendant for a serious offense, promoting respect for the law, and providing general deterrence.

I. Background[1]

  Between at least 2009 and 2020, Fire Alarm Electrical Corporation ("Fire Alarm Corp.") held contracts with four New York City agencies: the New York City Department of Citywide Administrative Services ("DCAS"), the New York City Department of Environmental Protection ("DEP"), the New York City Department of Education ("DOE"), and the New York City Department of Sanitation ("DSNY") (collectively, the "City Agencies"), to install, repair, replace, and maintain fire alarm systems in buildings owned and managed by the City Agencies. For the entire period of 2009 to 2020, defendant Walter Stanzione exercised primary control over Fire Alarm Corp.'s operations, despite not holding a formal title at the company. Defendant William Neogra served as Stanzione's second in command at Fire Alarm Corp., holding various titles including Vice President and President.

  In connection with the contracts with the City Agencies, Fire Alarm Corp. was required to submit documents to the City Agencies on a monthly basis detailing the work it had

---

[1] The following facts are derived from the Presentence Investigation Report ("PSR").

performed in buildings administered by the City Agencies. Among the documents that Fire Alarm Corp. included in these monthly submissions were invoices and other paperwork documenting the materials purchased and installed by Fire Alarm Corp. in those buildings. The monthly submissions included certifications stating that the information submitted to the City Agencies was truthful and accurate. Based on these monthly submissions and certifications, the City Agencies wired payments to Fire Alarm Corp.

From the beginning of the contracts, Stanzione and Neogra submitted monthly submissions containing fraudulent invoices which requested payment for fire alarm parts and supplies at artificially inflated prices, requested payment for fire alarm parts and supply models that did not exist, and fabricated invoices from alleged third-party vendors to support and justify their fraudulent payment requests.

In furtherance of the fraud and to conceal the fraud, Stanzione and Neogra submitted to the City Agencies invoices and other paperwork in the names of shell corporate entities secretly controlled by Stanzione and other co-conspirators. Among other things, the defendants directed Fire Alarm Corp. employees to design websites and logos for shell companies controlled by Stanzione that were listed on fraudulent invoices submitted to the City Agencies; used materials bearing the names of the shell entities to develop and implement a practice of marking up the purchase prices of fire alarm parts at multiples of their true costs, knowing that Fire Alarm Corp. had actually purchased the invoiced materials from different, legitimate retailers for less than claimed; and submitted to the City Agencies invoices and other paperwork that had been fabricated and fraudulently modified to appear as if they had been issued by legitimate retailers. As with the invoices and paperwork relating to the shell entities, Stanzione and Neogra included these fabricated and modified materials in the monthly submissions to seek payment from the City Agencies for fire alarm parts at dramatically inflated prices.

II.     Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

III.     Sentencing Guidelines

The United States Probation Department ("Probation") has calculated the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") as follows.

| | | |
|---|---|---:|
| | Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: | Loss Exceeding $1,500,00 (§ 2B1.1(b)(1)(I)) | +16 |
| Plus: | Sophisticated Means (§ 2B1.1(c)(10)(C)) | + 2 |
| Plus: | Manager or Supervisor of Criminal Activity (§ 3B1.1(c)) | + 2 |
| Less: | Acceptance of Responsibility (§ 3E1.1) | –3 |
| | Total: | 24 |

The defendant is in Criminal History Category I. PSR ¶¶ 35-36. Based on an Adjusted Offense Level of 24, Probation has calculated that the defendant's Guidelines range is 51 to 63 months' imprisonment. Id. ¶ 69.

The parties have calculated the defendant's Guidelines as follows.

| | | |
|---|---|---:|
| | Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: | Loss Exceeding $1,500,00 (§ 2B1.1(b)(1)(I)) | +16 |
| Plus: | Sophisticated Means (§ 2B1.1(c)(10)(C)) | + 2 |
| Less: | Zero-Point Offender (§ 4C1.1) | –2 |
| Less: | Acceptance of Responsibility (§ 3E1.1) | –3 |
| | Total: | 20 |

The total Adjusted Offense Level is 20, which, with a Criminal History Category of I, carries a Guidelines range of 33 to 41 months' imprisonment under the parties' Guidelines calculation. The defendant stipulated to this Guidelines calculation.

3

The government respectfully disagrees with Probation on the inclusion of a role enhancement, which, in turn, would also preclude the defendant from receiving credit as a zero-point offender. While the defendant was far from a low-level worker with minimal participation or agency over the scheme, the government believes describing him as a manager of the criminal activity slightly overstates his culpability. The evidence indicates that the defendant's co-defendant, Stanzione, exercised primary control over the offense. In the government's estimation, Stanzione alone should be classified as a leader of criminal activity.

IV.     Argument

The § 3553(a) factors weigh heavily in favor of a prison sentence within a range of 33 to 41 months' imprisonment. Such a sentence is sufficient but not greater than necessary to reflect the nature and circumstances of the offense, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to adequately deter criminal conduct.

The defendant argues that he should not be defined by the worst thing he did—a sentiment that the government largely agrees with as a guiding principle. That argument, however, has far more potency when the defendant stands convicted of conduct committed in a moment of desperation, or when the defendant is convicted of an act that can be seen as a true aberration from an otherwise lawful and decent life. That argument doesn't quite fit, however, when the conduct in question spanned more than a full decade and required hundreds if not thousands of discrete acts of fraud. Was the worst thing the defendant did the fraud he committed in November 2010? Or was it the fraud he committed in January 2019? To the extent that the defendant means "all of it and everything in between," this argument just doesn't fit here. The defendant spent approximately a fifth of his life defrauding New York City—about the same time he needed to go from first grade to graduating high school. There are cases where the "moment of weakness" argument is appropriate, but this case—to be frank—is not one of them.

It's worth highlighting what was necessary to commit this fraud. Every month, the defendants would submit a packet of information to the various City Agencies, documenting the work that they claimed to have done. The packet would include documentation about the parts that the company allegedly installed in various city buildings, so that the defendants could be reimbursed for what they spent and receive a 10-20% markup—the agreed upon profit that was built into their contracts.

This is what happened behind the scenes. The defendants purchased the parts from legitimate retailers. They would then reinvoice the parts to one of Walter Stanzione's companies, tripling or quadrupling the prices, and changing the names and model numbers of the parts so that the drastic surcharge they applied could not be googled or otherwise exposed. They would then submit the false invoices to the City Agencies and ask for the contractual 10-20% profit on top of it. So, for example, $1000 in actual purchases would be converted to $4000 in fake invoices, plus a $400-800 profit on top.

4

The losses for the City Agencies slowly accreted in his matter—a few thousand dollars at a time, repeated monthly for over a decade. The losses incurred by the City Agencies are an estimate, and a low one at that, as it primarily reflects the losses between 2009 and 2018, which does not capture the entirety of the fraud. This is not a case where the loss to the victims was overstated based on unforeseen external circumstances; the losses here accumulated, month by month, through countless individual acts of fraud.

To backstop the fraud, the defendant helped created fake industry documentation (known as "cut sheets") to bolster the purported reality of the parts they were inventing. These too were submitted to the City Agencies. When the City Agencies got suspicious of a given Stanzione shell company, they switched to another—moving from FA Distributors to Ficomsec to Firealarm.com and others. When the City Agencies got truly suspicious, co-defendant Walter Stanzione borrowed company names from another fraudster, David Motovich—currently awaiting sentencing before the Honorable William F. Kuntz—and created fake websites and logos to support the documentation the defendants created. On other occasions, they commandeered and modified the letterhead of a real business, Colonial Electric Supply, and submitted several dozen invoices that purported to be from that company (revealing this aspect of the fraud by misspelling electric as "Electic" on the false letterhead they created).

This process—false invoices, false cut sheets, false logos, false websites—went on month after month, and continued for years. At its peak, the company was doing this with four separate City Agencies simultaneously. The fraud here was routinized—a fraud assembly line. Again, there is aberration and there is this, its complete and polar opposite. The fraud here was truly systemic.

The defendant makes much of his role in this operation. As an initial matter, the government agrees that Walter Stanzione was the leader, and he should be held primarily responsible for its commission. Several others were knowingly involved, including several members of Stanzione's family and the defendant. During the entirety of the fraud, the defendant was Stanzione's clear #2 in the operation. The defendant understood the engineering side of the business better than anyone else, and he was often sent as the face of the company to meetings with City Agencies. On scores of occasions, the defendant signed his name to certify the truth of the packets that the company submitted to the city, befitting his role as "President" of the company. At least one witness described them as bickering spouses running the operation. In sum, the defendant was beneath Stanzione but above the rest.

Given that the defendant took his orders from Stanzione, the government declined to give the defendant leadership points—admittedly a close question, but one that the government settled in favor of the defendant. As a result, the defendant was able to receive additional credit as a zero-point offender, further lowering his Guidelines range. As such, the Guidelines already reflect a rather conservative version of the defendant's culpability. Make no mistake, however—the defendant was no mere factotum, and played a guiding role orchestrating the fraud.

To choose one representative example, in May 2014, the defendant instructed an employee to purchase the following parts from ADI, a legitimate retailer of fire alarm parts:

5

| Quantity | Product | Part Number | Price per Unit |
|---|---|---|---|
| 2 | NAC power extender | AL802ULADA | $277.99 |
| 36 | 12V 7AH battery | IM-1270 | $12.99 |
| 6 | 12V 12AH battery | IM-12120 | $23.99 |
| 36 | Voice system speakers | SSPKCLPR | $17.85 |

Two months later, Fire Alarm submitted a false invoice for these same parts under the letterhead of "Pine Sach," a company belonging to the Motovich family that does not sell fire alarm parts. Metadata and email traffic show that it was the defendant that created these new invoices, in which the prices and part numbers changed dramatically:

| Quantity | Product | Part Number | Price per Unit |
|---|---|---|---|
| 2 | NAC power extender | AX-308 | $1,263.26 |
| 36 | 12V 7AH battery | FAGB-1270 | $49.24 |
| 6 | 12V 12AH battery | FAGB-12120 | $88.44 |
| 36 | Voice system speakers | GSO-C1 | $75.42 |

The defendant thus converted a legitimate bill for $1810.16 into a fraudulent bill for $7544.92 (not yet including their permissible "profit"), complete with fake part numbers that could not be googled. To make the prices look legitimate, Fire Alarm Corp. submitted fake price quote documents from two other companies—Ago & Alaudin and Colonial Electrical Supply—both of which were created by the defendant as well. Contemporaneous emails show the defendant and Stanzione trading copies of logos for use in these secondary invoices and then copy editing the fake websites set up to backstop the fraud. The fraudulent invoices were then further supported by fraudulent "cut sheets" that the defendant instructed other employees to create over the years, and which the defendant himself curated in a folder for ease of use. Conduct like this repeated month after month, with the defendant at the center of the activity.

   The defendant also makes much of his advanced age. The government submits the defendant's age should not significantly affect the sentence imposed. The defendant is 65 years old but was in his late 40s when this crime began. His advanced age is a reflection of just how long he and Stanzione defrauded the City Agencies. Had he and Stanzione been arrested in year two of this fraud, he would have been charged with the exact same crimes, but he would have stood before this Court as someone in his early to mid-50 and would have found such age arguments unavailable. It would reflect a rather perverse miscarriage of justice if the defendant successfully argued he should not be punished as severely precisely because he successfully perpetrated the same crime for a whole additional decade. Many individuals age out of their crimes—neither Stanzione nor Neogra did.

   Finally, the government submits that general deterrence requires a significant sentence. The defendants cheated four different City Agencies for more than a decade and only ceased when exposed by law enforcement. Fraud of this kind often goes unpunished, and examples must be made of those who are uncovered—especially in situations, like here, where the fraud was so incredibly comprehensive and long-lasting. There must be consequences for actions like these, and a message must be sent to those who would consider doing the same.

V.        <u>Restitution</u>

Pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. §§ 3663A and 3664(j)(1), restitution to the City Agencies is mandatory. The government is still working with defense counsel and the Probation Department to determine an appropriate restitution figure. The government respectfully requests permission to advise the Court further about this matter, and if necessary, request additional time to provide the correct figure. 18. U.S.C. § 3554(d)(5) ("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

VI.       <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a term of imprisonment within the applicable Guidelines range.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
Erik Paulsen
Michael Gibaldi
Eric Silverberg
Assistant U.S. Attorney
(718) 254-6365

cc:    Clerk of the Court (RPK) (by ECF & E-Mail)
       John Kaley, Esq. (by ECF & E-Mail)
       Erica Vest, United States Probation Officer (by E-Mail)